*Re*: REGLAS PARA LA CREACIÓN Y FUNCIONAMIENTO DE LA UNIDAD ESPECIAL DE JUECES DE APELACIONES.

*Número:* ER-93-4          *Resuelto:* 1 de diciembre de 1993

## RESOLUCIÓN

### Regla 1. Base Legal

Las presentes reglas se adoptan en virtud de las disposiciones del Art. V de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, de la Ley Núm. 11 de 2 de junio de 1993 y del ordenamiento procesal vigente.

### Regla 2. Creación del cuerpo

Previa recomendación del Juez Presidente, se crea la Unidad Especial de Jueces de Apelaciones, adscrita a la Oficina del Juez Presidente del Tribunal Supremo de Puerto Rico.

## Regla 3. Composición

Dicha unidad especial estará compuesta por los jueces de apelaciones nombrados en virtud de la Ley Núm. 21 de 13 de julio de 1992 que creó el Tribunal de Apelaciones, derogado mediante la Ley Núm. 11 de 2 de junio de 1993.

## Regla 4. Personal y Administración

La Unidad Especial de Jueces de Apelaciones contará con un Juez Coordinador, una Subsecretaría que intervendrá con la tramitación de todos los casos, procedimientos o asuntos que se le refieran, un alguacil general y el personal auxiliar necesario que determine el Juez Presidente para su eficiente operación.

## Regla 5. Funciones

Los jueces de apelaciones ejercerán las funciones siguientes:

A.    Atenderán, como comisionados especiales, los casos, asuntos o procedimientos judiciales que les encomiende el Tribunal Supremo.

B.    Desempeñarán las funciones judiciales y encomiendas especiales pertinentes a la Rama Judicial que les asigne el Juez Presidente.

## Regla 6. Funcionamiento

Los jueces de apelaciones, en atención a las funciones o tareas judiciales que se les asignen, funcionarán individualmente o en paneles de no más de tres (3) jueces por determinación del Juez Presidente.

El Juez Presidente nombrará los paneles y el Presidente de cada panel; establecerá el término de su duración y determinará el sistema de asignación de asuntos a los paneles en forma automática rotativa, siguiendo el orden de

referimiento de asuntos, que deberá implantar el Juez Coordinador de la Unidad Especial.

### Regla 7. Trámite de Casos o Procedimientos Referidos por el Tribunal Supremo

A. El Tribunal Supremo podrá encomendar cualquier caso, asunto o procedimiento ante su consideración para ser atendido por los jueces de apelaciones mediante orden al efecto.

B. Cualquier parte puede solicitar en su escrito ante el Tribunal Supremo que se refiera el asunto a la Unidad Especial de Jueces de Apelaciones, según lo dispuesto en las presentes reglas.

C. El Secretario del Tribunal Supremo notificará a las partes de la orden del Tribunal y pasará el asunto a la Subsecretaría de la Unidad Especial para su trámite.

### Regla 8. Administración de los calendarios y procedimientos

Los jueces de apelaciones deberán llevar a cabo su encomienda con diligencia y deberán someter su informe al Tribunal Supremo dentro del término de sesenta (60) días a partir de la fecha en que el asunto quede sometido.

### Regla 9. Informe

A. Los jueces de apelaciones prepararán un informe con un resumen de los hechos y análisis del derecho aplicable que será notificado a las partes por la Subsecretaría de la Unidad Especial y referida por ésta a la Secretaría del Tribunal Supremo de Puerto Rico.

B. Dentro de los diez (10) días laborables siguientes a la notificación de haberse sometido al Tribunal Supremo el referido informe, cualquiera de las partes podrá presentar al Tribunal Supremo sus objeciones al mismo, debidamente fundamentadas, mediante moción y notificación a la

otra parte dentro del referido término. La notificación se hará conforme lo dispuesto por la Regla 67 de Procedimiento Civil, 32 L.P.R.A. Ap. III.

El Tribunal Supremo, atendidos los señalamientos de las partes, si los hubiese, adoptará, modificará o no dará curso a dicho informe mediante la resolución o el dictamen que estime procedente.

*Regla 10. Ubicación*

La Unidad Especial de Jueces de Apelaciones estará ubicada en el décimo piso del Centro Judicial de San Juan.

*Regla 11. Vigencia*

Estas reglas entrarán en vigor el 1ro de diciembre de 1993.

*Regla 12. Publicación*

*La presente resolución será publicada.*

Lo acordó el Tribunal y certifica el señor Secretario General. El Juez Asociado Señor Alonso Alonso emitió una opinión de conformidad, a la cual se unieron el Juez Presidente Señor Andréu García y los Jueces Asociados Señores Hernández Denton y Fuster Berlingeri. El Juez Asociado Señor Negrón García disintió mediante opinión escrita. Los Jueces Asociados Señor Rebollo López y Señora Naveira de Rodón emitieron individualmente opinión concurrente y disidente.

(*Fdo.*) Francisco R. Agrait Lladó
*Secretario General*

– O –

Opinión de conformidad del Juez Asociado Señor Alonso Alonso, a la cual se unieron el Juez Presidente Señor Andréu García y los Jueces Asociados Señores Hernández Denton y Fuster Berlingeri.

Las Reglas para la Creación y Funcionamiento de la Unidad Especial de Jueces de Apelaciones aprobadas por este Tribunal tienen como *propósito principal* preservar y mejorar en forma innovadora y creativa *la calidad de la administración pública y de la justicia* mediante el mejor uso de los recursos humanos y fiscales existentes; aumentando la eficiencia del sistema judicial y, por consiguiente, una justicia rápida, económica y eficiente. Es, además, un esfuerzo adicional por parte de este Tribunal de responder a las nuevas realidades y necesidades de la sociedad contemporánea, una de cuyas características es ser una sociedad cada vez más litigiosa.

La aprobación de estas reglas constituye un ejercicio *válido y necesario* de nuestras facultades constitucionales expresas e inherentes.

I

Las reglas benefician principalmente a las partes que acuden a este Foro, quienes tienen una expectativa legítima de que sus casos sean resueltos no sólo bien, sino en forma expedita. Esto de por sí justifica la decisión que hemos tomado.

Por otra parte, dicha decisión permite a este Foro atender con mayor prioridad su función de pautar e interpretar el derecho y de involucrarse más, y en forma más ágil y rápida, en áreas de nuestro ordenamiento jurídico sustantivo y procesal que requieren que se actualice la administración de la justicia a las nuevas realidades y necesidades de la sociedad contemporánea.

Permite, además, utilizar el caudal de conocimientos, experiencias, talentos y destrezas judiciales de los jueces apelativos en funciones judiciales para las cuales ellos están precisamente capacitados.

También es un paso de avance para mantener nuestro sistema judicial actualizado, dinámico y responsivo a los nuevos retos del nuevo siglo que se avecina. Al así hacerlo, le insuflamos energía adicional a un sistema judicial que le ha servido bien al país, que está a la altura de los mejores del mundo, y que se mantiene a la vanguardia en su crecimiento y desarrollo.

Esta medida *es una de varias* que ha tomado este Tribunal y su Presidente para mantener el sistema judicial en pleno desarrollo.(¹)

Todas estas medidas van encaminadas *a evitar* los problemas que presentan las organizaciones gubernamentales y privadas que exhiben excesos de burocratización, distanciamiento entre los que sirven y a los que hay que servir, desplazamiento de objetivos y funciones principales por el enmohecimiento de estructuras y procedimientos, la rutinización de funciones y actividades, y la natural resistencia al cambio, a la experimentación, al aprendizaje y a buscar nuevas formas de hacer las cosas y de enfrentarse a nuevas realidades y necesidades sociales y económicas.

Estos problemas comunes en Puerto Rico, Estados Unidos y en el nivel internacional han sido, y siguen siendo, objeto de extenso análisis por reconocidos estudiosos de la

---

(¹) *Entre otras*, cabe mencionar las siguientes: El Sistema y la Comisión de Evaluación de Jueces; las Reglas de Procedimiento para Acciones Disciplinarias y de Separación del Servicio por Razón de Salud de Jueces del Tribunal de Primera Instancia y del Tribunal de Apelaciones de Puerto Rico; el Comité de Reforma Judicial y de Administración del Tribunal de Primera Instancia; el fortalecimiento de la informativa; el estudio y la celebración de Conferencias Judiciales encaminadas a adoptar nuevas Reglas de Procedimiento Civil, Criminal, de Evidencia y un Reglamento Notarial; el uso de equipo de difusión por los medios de comunicación en los procesos judiciales; así como sobre la Jurisdicción Voluntaria y la creación de una Comisión para estudiar el discrimen por razón de género en los tribunales, y el aumento en la productividad de este Tribunal y la explicación que éste hace de las razones que motivan la denegación de los recursos presentados ante nos.

administración pública y privada, y de la administración de la justicia contemporánea. Sobre el particular, véanse, a manera de ejemplos: A. Etzioni, *The Active Society*, 1967, Cap. I; H. Simon, *The Sciences of the Artificial*, Cap. 4; H. Kaufman, *The Limits of Organizational Changes*, Cap. 1; M.A. Morales, *Administración Pública, Gobierno y Teoría de la Organización*, Master Type Setting and Word Processing, 1982; R. Mangabeira Unger, *Law in Modern Society*, Fee Press, 1976; D. Rosembloom, *Public Administration and the Law*, Dekker, Mimeo, 1983, Caps. 1, 4, 7; F.A. Cramer, *Dynamic of Public Burocracy*, Winthrop Publishers, Inc., 1977; Fiss, *The Social and Political Foundations of Adjudication*, 6 (Núm. 2) Law and Human Behavior 121–128 (1982); L.C. Gawthrop, *Organizing for Change*, Mimeo, 1983; L.L. Fuller, *The Forms and Limits of Adjudication*, 92 (Núm. 2) Harv. L. Rev. 353 (1978); Sander, *Varieties of Dispute Processing*, 70 F.R.D. 79, 111–134 (1976); D. McGillis, *The Quiet (R)Evolution in American Dispute Settlement*, 31 (Núm. 2) Harv. L. Sch. Bull. 20 (1980); *Métodos alternos de resolver disputas*, págs. 1–72 (Informe al Secretariado de la Conferencia Judicial, octubre de 1980); Junta de Planificación de Puerto Rico, *Proyecto Puerto Rico 2005*, noviembre de 1992.

Este Tribunal tiene que asumir una función de liderato institucional para lograr que la Rama Judicial siempre responda eficientemente a las expectativas y necesidades de aquellos que tocan a sus puertas. Las reglas persiguen este *único* propósito.

## II

*Las reglas constituyen un ejercicio válido de las facultades constitucionales de este Tribunal*

Las reglas son un ejercicio válido de nuestras facultades constitucionales, tanto expresas como inherentes. Nuestra

Constitución en la Sec. 4 del Art. V expresamente dispone que:

El Tribunal Supremo funcionará, *bajo reglas de su propia adopción* .... (Énfasis suplido.) L.P.R.A., Tomo 1, ed.1982, pág. 356.

Adoptamos estas reglas como parte de nuestra facultad constitucional de regir nuestro proceso decisorio, estructuración y funcionamiento interno, y en virtud de las facultades que nos confiere todo el Art. V de nuestra Constitución, *supra.*

Como expresara en *Torres Rivera v. González Padín & Co., Inc.*, 133 D.P.R. 656, 665 (1993), "[e]s prerrogativa de este Tribunal el autoreglamentarse y adoptar aquellos mecanismos que estime apropiados con el fin de cumplir con sus obligaciones constitucionales de la forma que estime más adecuada y eficiente".

El historial de la Convención Constituyente sobre las diversas cláusulas constitucionales relativas a la Rama Judicial avalan nuestra posición. El Presidente de la Comisión de la Asamblea Constituyente sobre la Rama Judicial, el Lcdo. Ernesto Ramos Antonini, al explicar a la Asamblea Constituyente el alcance de dicha disposicion *enfatizó* que el *propósito cardinal* de dichas cláusulas era lograr *la eficiencia del Poder Judicial* como instrumento democrático del Pueblo. A esos efectos expresó lo siguiente:

La Comisión de la Rama Judicial de esta Convención tuvo, en todo momento, desde el inicio de sus trabajos, como *propósito cardinal* en su tarea, la que sin duda alguna es el propósito de todas las comisiones en relación con la organización de los tres poderes que constituyen la forma republicana de gobierno en el sistema que habremos de crear, o sea, *el propósito de la eficiencia del poder judicial como instrumento democrático del pueblo.*
Según la proposición sustituta sometida por la comisión, *creemos haber logrado ese propósito.*
*El propósito de eficiencia en la organización y funcionamiento de la rama judicial*, está íntimamente vinculado y depende fundamentalmente, en lo que toca a la rama judicial, repito, de la independencia del poder judicial. Esa independencia a que pro-

pende la proposición sustituta, como ideal en la organización de la estructura de gobierno que vamos a crear y dada la función del poder judicial, cual es la de garantizar en nuestra vida política, social y económica un régimen de derecho a diferencia de un régimen de fuerza o de hombres.

Función primordial del sistema del poder judicial, es garantizar en la vida social el respeto de los derechos de cualesquiera intervenciones contrarias a esos propios derechos, por parte del poder ejecutivo, del poder legislativo o de cualesquiera otras fuerzas organizadas o elementos que puedan en cualquier momento atentar contra esos derechos del ciudadano. Eso sólo se logra mediante la firme cimentación de un régimen de derecho en una sociedad democrática.

Este proyecto, esta proposición, al crear el sistema integrado de los tribunales de justicia en Puerto Rico en torno a jurisdicción, funcionamiento y administración, a nuestro juicio, garantiza de manera plausible la independencia del poder judicial.

La independencia del poder judicial, se garantiza, a nuestro juicio, según la proposición, mediante alrededor de diez (10) características que contiene el proyecto. (Énfasis suplido.) 1 Diario de Sesiones de la Convención Constituyente 451–452. Véase, además, nuestras expresiones en *Negrón Soto v. Gobernador*, 110 D.P.R. 664, 665 (1981).

La letra clara de la Sec. 4 del Art. 5 de nuestra Constitución, *supra*, y de las demás disposiciones de la misma que tienen que ver con la Rama Judicial, así como los precedentes de este Tribunal, han delineado claramente las funciones expresas e inherentes de este Foro. Véanse: Diario de Sesiones, *supra*, págs. 452–454, 771–772; Conferencia Judicial de Puerto Rico, *La independencia judicial en Puerto Rico*, octubre de 1988; *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750 (1977); *Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986); *Betancourt v. Gobernador*, 119 D.P.R. 435, 436, 444 (1987), opinión concurrente; *In re Solicitud Cepeda García*, 130 D.P.R. 18 (1992).

[Nuestra Constitución es un documento dinámico que] no establece, ni debe establecer, normas para la hora que pasa, sino principios para un futuro que se expande. B.N. Cardozo, *La naturaleza de la función judicial*, Buenos Aires, Eds. Arayú, 1955, pág. 64.

Este Tribunal, al sopesar los derechos constitucionales del pueblo frente al Estado, ha asumido posiciones de vanguardia, valientes y sabias, imprimiéndole a nuestra Constitución el dinamismo necesario para atender no sólo las circunstancias del momento, sino las del futuro (*Noriega v. Gobernador*, 122 D.P.R. 650 (1988), y *Noriega v. Gobernador*, 130 D.P.R. 919 (1992), para que ésta no se convierta en una pieza de museo o sea como los Rollos del Mar Muerto (*P.R. Tel. Co. v. Martínez*, 114 D.P.R. 328, 350 (1983)).

Sería un contrasentido jurídico que interpretáramos restrictivamente nuestras facultades constitucionales cuando precisamente se trata de proveerle *más eficiencia* al Poder Judicial, según fue la intención expresa de la Convención Constituyente. Este Tribunal no se puede autolimitar cuando de mejorar la calidad de la administración de la justicia se trata. Después de todo, como atinadamente expresara el distinguido Profesor de Derecho y Ex Juez Asociado de este Tribunal, Don Raúl Serrano Geyls:

> Es procedente, por lo tanto, reconocer que una constitución debe interpretar la situación vital de un pueblo en su sentido esencialmente dinámico, captando la trayectoria de su evolución sin limitarse al reflejo estático de su situación en un momento dado. (Énfasis en el original suprimido.) R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1986, Vol. I, pág. 5.

Debo destacar que bajo el esquema y el procedimiento que hemos adoptado, este Tribunal *siempre retiene la facultad* de examinar todos los recursos que se le presentan y determinar si deniega o expide los mismos (así como atender todas las apelaciones criminales), y tomar la decisión *final* sobre cada recurso y adoptar la explicación que de ella haga. Con la adopción de las reglas, el Tribunal *no ha* delegado en los Jueces Apelativos su función de expedir y de decidir los recursos que se le presenten.

Las reglas no prohíben que este Tribunal designe un sólo Juez Apelativo para actuar como Comisionado (véase

el primer párrafo de la Regla 6). Tampoco prohíbe que otros Jueces del Tribunal General de Justicia sean designados como Comisionados. Las reglas proveen suficiente flexibilidad para el mejor funcionamiento de la unidad que se crea. *Tampoco persiguen crear confrontaciones con las otras ramas de gobierno. Su propósito ya lo hemos explicado en detalle. Además, se hace el uso más fructífero, dentro de las opciones que tenemos, de un talento humano y de aproximadamente un millón cuatrocientos mil dólares ($1,400,000) al año en mejorar la calidad de la justicia.*[2]

En síntesis, no existe impedimiento constitucional alguno para adoptar estas reglas. La Constitución lo permite, las realidades y las necesidades de nuestra sociedad contemporánea y nuestro empeño en preservar y mejorar la calidad de la administración pública y de la justicia exigen que éstas sean adoptadas.

## – O –

Opinión concurrente y disidente emitida por el Juez Asociado Señor Rebollo López.

Repudiamos la acción tomada en el día de hoy por una mayoría de los integrantes del Tribunal. *La misma no es otra cosa que un subterfugio administrativo mediante el cual ilegalmente se pretende perpetuar al extinto Tribunal de Apelaciones.*

La Constitución de Puerto Rico le confiere a este Tribunal la responsabilidad de administrar, con eficiencia y conforme los dictados de la misma, nuestro sistema de justicia. Este Foro, sin embargo, *no tiene autoridad* para

---

[2] Actualmente hay catorce (14) Jueces Apelativos cuyo salario por ley es de setenta mil dólares ($70,000) anuales, el cual no puede ser alterado por el término que ocupen sus cargos por mandato constitucional. Ello conlleva un desembolso de novecientos ochenta mil dólares ($980,000) anuales en fondos públicos lo cual, unido a los salarios de sus respectivas secretarias personales y a los beneficios dispuestos por ley, suman alrededor de un millón cuatrocientos mil dólares ($1,400,000).

administrativamente crear tribunales de facto o para perpetuar aquellos que han sido suprimidos por la Asamblea Legislativa en el válido ejercicio de sus prerrogativas constitucionales, como tampoco para ignorar una clara política pública establecida por la referida Asamblea Legislativa.

No obstante entender que resultaría apropiada y válida la asignación por el Tribunal, entre otras, de funciones de Comisionado Especial, de manera individual, a los jueces del extinto Tribunal de Apelaciones —razón por la cual concurrimos con la Resolución mayoritaria emitida([1])— *por los fundamentos que exponemos en la Parte IV de esta ponencia rechazamos el hacernos cómplices de todo un "montaje administrativo" cuyo único objetivo es el de preservar y mantener en funciones a un tribunal que fue suprimido por la Legislatura mediante la aprobación de la Ley Núm. 11 de 2 de junio de 1993.*

*La actuación del Tribunal en el día de hoy* —en adición a infringir la Constitución de Puerto Rico, al usurpar las prerrogativas constitucionales de la Asamblea Legislativa; ser contraria a la clara política pública establecida por la citada Ley Núm. 11 de 1993; y constituir, en consecuencia, un uso ilegal de fondos públicos— *es demostrativa de una sorprendente ausencia de buen juicio por parte de la Mayoría, la cual sitúa al Tribunal en un peligroso curso de colisión con las Ramas Ejecutiva y Legislativa de nuestro Gobierno; actuación mayoritaria que inevitablemente le causará un grave daño a la Rama Judicial de Puerto Rico.*

I

A diferencia de la mayoría de los integrantes del Tribunal, *nos opusimos a la creación del Tribunal de Apelaciones:* Al así actuar, expresamos en dicha ocasión el criterio de que dicho foro judicial *era realmente innecesario*

---

([1]) Dicha resolución contempla, en su Regla 6, la posibilidad de que dichos jueces sean designados, de manera individual, como Comisionados Especiales.

ya que la *principal razón* que se aducía en apoyo del mismo —esto es, la existencia de un gran número de casos, pendientes de resolución final, ante el Tribunal Supremo— *no justificaba la creación, del mencionado foro apelativo.*

Ello en vista del hecho de que el referido "atraso de casos pendientes" *era una situación anormal, no recurrente, que tenía solución mediante la utilización de otros métodos alternos que eran menos costosos para el erario público y más efectivos y rápidos en la solución del problema.* No obstante nuestras objeciones, y la de numerosas otras voces, la Asamblea Legislativa decidió establecer el referido Tribunal de Apelaciones. Así lo hizo mediante la aprobación de la Ley Núm. 21 de 13 de julio de 1992. Dicho foro judicial, no hay duda, resolvió una serie de asuntos durante el período de tiempo en que operó; ayudando a resolver, en parte, el problema de atraso de casos entonces pendientes ante este Tribunal. Su labor, sin embargo, *no* fue "nada del otro mundo".

Como surge de la comparecencia especial que el Juez suscribiente hiciera, por escrito, ante la Asamblea Legislativa de fecha 29 de abril de 1993, *en apoyo de la eliminación del Tribunal de Apelaciones,* el número de casos efectivamente resueltos, por sentencia, por el referido foro apelativo durante el período de tiempo en que funcionó fue uno sorprendentemente reducido.([2]) *Ello constituye prueba irrefutable de que la creación, y operación, del Tribunal de Apelaciones constituyó un monstruoso gasto innecesario de fondos públicos ya que se hubiera logrado lo mismo mediante la implantación de métodos alternos menos costosos tales como la reactivación de la División de Apelaciones, o "Salas Apelativas", del Tribunal Superior de Puerto Rico.*

La Asamblea Legislativa de Puerto Rico así, finalmente,

---

([2]) De hecho, y como igualmente surge de nuestra comparecencia especial, el número de casos promedio, por juez, resuelto por los quince (15) jueces del Tribunal de Apelaciones fue sustancialmente menor al número de casos promedio, por juez, resueltos por los siete (7) integrantes del este Tribunal durante el mismo período de tiempo.

lo entendió y concluyó; procediendo a eliminar o suprimir el referido Tribunal de Apelaciones mediante la aprobación de la Ley Núm. 11, *supra*. Al así actuar, *la Rama Legislativa de nuestro Gobierno estableció una clara política pública, la cual este Tribunal viene obligado a reconocer, respetar y poner en ·vigor.*

La referida actuación legislativa, avalada por las disposiciones de la Sec. 2 del Art. V de la Constitución de Puerto Rico,[3] le impuso, a su vez, una obligación de actuar al Juez Presidente de este Tribunal. Esto es, la de asignarle a los integrantes del foro judicial suprimido otras "funciones judiciales"; obligación del Juez Presidente que surge de las disposiciones de la Sec. 13 del Art. V de nuestra Constitución.[4]

No hay duda que cualquier función judicial que le sea asignada a estos jueces *tiene que tener como objetivo último el mejoramiento del sistema judicial puertorriqueño.* Se nos ocurren varias que entendemos redundarían en beneficio de la ciudadanía puertorriqueña.[5] Esa función, sin embargo, no nos corresponde ejercerla. Como hemos visto, ello le corresponde al señor Juez Presidente de este Tribunal.

Ahora bien, ¿está jurídicamente impedido el Tribunal para designar, *de manera individual*, a los jueces del extinto Tribunal de Apelaciones para que éstos actúen como

---

[3] La referida disposición constitucional establece:

"Los tribunales de Puerto Rico constituirán un sistema judicial unificado en lo concerniente a jurisdicción, funcionamiento y administración. La Asamblea Legislativa, en cuanto no resulte incompatible con esta Constitución, podrá crear y suprimir tribunales, con excepción del Tribunal Supremo, y determinará su competencia y organización." L.P.R.A., Tomo 1, ed. 1982, pág. 355.

[4] La mencionada disposición constitucional dispone:

"De modificarse o eliminarse por ley un tribunal o una sala o sección del mismo, la persona que en él ocupare un cargo de juez continuará desempeñándolo durante el resto del término por el cual fue nombrado, y ejercerá aquellas funciones judiciales que le asigne el Juez Presidente del Tribunal Supremo." Const. E.L.A., *supra*, pág. 361.

[5] A manera de ejemplo, y no como un listado taxativo, podemos sugerir las siguientes funciones: la asignación de dichos jueces a presidir casos complejos a nivel de instancia; la sustitución y relevo de jueces del Tribunal Superior y/o la reasignación, en forma permanente, a salas de dicho Tribunal Superior; encomiendas especiales, tales como la actuación individual como comisionados especiales.

"comisionados especiales" en casos o asuntos pendientes ante este Foro con el propósito de que éstos nos rindan un *informe*, como lo hacen los oficiales jurídicos que laboran en nuestras Oficinas, sobre los méritos de dichos casos y luego este Tribunal resuelva lo que en derecho proceda?

Aún cuando se nos ocurren otras alternativas mucho más provechosas y beneficiosas que la labor en controversia, y aún cuando la necesidad de la misma realmente no es mucha, *no* tenemos duda alguna de que el Tribunal tiene el poder y la autoridad constitucional para así hacerlo. Veamos.

## II

Las Secs. 1 y 3 del Art. V de la Constitución del Estado Libre Asociado, *supra*, págs. 355 y 356, establecen, en lo pertinente, que el "Poder Judicial de Puerto Rico se ejercerá por un Tribunal Supremo" y que el "Tribunal Supremo será el tribunal de última instancia en Puerto Rico ...".

Por otro lado, la Sec. 4 del mencionado Art. V de la Constitución, *supra*, pág. 356, establece, en lo pertinente, que el "Tribunal Supremo *funcionará, bajo reglas de su propia adopción*, en pleno o dividido en salas compuestas de no menos de tres jueces". (Énfasis suplido.)

De manera, pues, que es claro que el Tribunal Supremo de Puerto Rico —*siempre y cuando actúe dentro de los parámetros que establece la Constitución de Puerto Rico*— tiene facultad para decidir cómo llevar a cabo su función decisoria o adjudicativa; ello mediante las reglas que, a esos efectos, adopte y los mecanismos de ayuda, de índole institucional, que establezca con el propósito de poder descargar su función judicial decisoria de la manera más ilustrada posible. Eso es, *precisamente*, lo que el Tribunal estaría haciendo al establecer un mecanismo mediante el cual se nombrara, *de manera individual*, como comisiona-

dos especiales, entre otros, a los jueces del extinto Tribunal de Apelaciones.(⁶)

Bajo dicho esquema, naturalmente y por imperativo constitucional, *el Tribunal conservaría y mantendría la facultad exclusiva de decidir las controversias que se plantean en los referidos casos o asuntos conforme el criterio mayoritario de sus integrantes*. No se lesionaría de ninguna manera, en consecuencia, el proceso deliberativo-decisorio interno.(⁷)

---

(⁶) *Nada más y nada menos. No* se estaría creando un tribunal; *no* hay facultad para ello. *No se estaría delegando ni, mucho menos, abdicando el poder decisorio, o facultad adjudicativa del Tribunal.* Dicho poder decisorio o facultad adjudicativa, se mantendría, en todo su vigor, en el seno del Tribunal. Llana y sencillamente se estaría estableciendo un mecanismo forense adicional que nos facilitaría llevar a cabo, *de una manera más informada,* nuestra delicada función decisoria; *ello en beneficio de la ciudadanía en general.*

A diferencia de ello, establecer que el "informe" sea rendido por tres jueces denota la clara intención de asemejarlo a un tribunal colegiado —*como el que existía bajo la derogada Ley Núm. 21 de 13 de julio de 1992, ley que creó el extinto Tribunal de Apelaciones*— donde el "producto final" del consenso de los tres jueces, la sentencia, tenía consecuencias y efectos legales. No siendo esa ya la situación, no tiene ningún sentido lógico ni práctico que sean tres los jueces que laboren en la redacción del informe. *Dicha actuación, en consecuencia, no puede tener otra finalidad y propósito que perpetuar el derogado Tribunal de Apelaciones, lo cual resulta ser ilegal por ser contraria a la clara política pública establecida mediante la Ley Núm. 11 de 2 de junio de 1993.*

(⁷) Si es que el Tribunal Supremo efectivamente no tiene poder inherente —proveniente el mismo de las citadas Secs. 1, 3 y 4 del Art. V de nuestra Constitución, L.P.R.A., Tomo 1— para adoptar dicho mecanismo, *entonces, lamentablemente, hemos venido actuando inconstitucionalmente desde hace muchos años sin que integrante alguno de este Tribunal haya dado la voz de alerta y/o alzado su voz en protesta.*

Nos referimos, naturalmente, a la creación, y utilización, por este Tribunal del Panel Central que opera en el mismo; panel que resulta de gran ayuda a todos los integrantes del Tribunal en la disposición, semana tras semana, de los *recursos discrecionales* que se radican, *tanto en asuntos criminales como civiles*, ante el Tribunal.

No constituye secreto alguno —*no hay razón alguna para que ello sea así*— que los integrantes de dicho Panel Central *individualmente* examinan los referidos recursos y posteriormente, *de manera individual*, nos rinden un memorando o informe donde, luego de exponer una relación de los hechos pertinentes del caso, las controversias planteadas, y una exposición del derecho que ellos entienden aplicable, nos hacen una recomendación sobre si el Tribunal debe expedir, o no, el recurso radicado.

Todos los integrantes del Tribunal, como parte del análisis que hacen del recurso radicado y en relación con la decisión que van a emitir en el Pleno del Tribunal respecto a la expedición o no del recurso, *leen y consideran el informe rendido por uno de los integrantes del Panel Central. ¿Es* ello inconstitucional o impropio? *No* creemos que lo sea. Ello así ya que dicho informe es utilizado, por los Jueces, *meramente como un mecanismo de ayuda en la función decisoria que la Constitución y las leyes de este*

## III

Por otro lado, no tenemos duda alguna que la labor que—*entre otras y de manera individual*—podríamos encomendarle a los integrantes del extinto Tribunal de Apelaciones como comisionados especiales efectivamente constituiría una "función judicial", propia del desempeño del cargo de juez.(8) Pero, *hay más*. Aun asumiendo, a los fines de la argumentación, que la función de comisionado especial *individual* que le encomendaríamos a los Jueces del extinto Tribunal de Apelaciones no cualificara como una "judicial", aún así no hay problema de inconstitucionalidad alguno. La historia de la Judicatura Puertorriqueña revela varias ocasiones en que Jueces del Tribunal de Primera Instancia han sido designados para realizar labores *no* judiciales, la legalidad de cuyas situaciones o actuaciones han sido avaladas por este Tribunal. Elocuente, en este aspecto, resulta ser la decisión que emitió el Tribunal en *Negrón Soto v. Gobernador*, 110 D.P.R. 664 (1981).(9)

---

*País le imponen.* Distinto sería el caso, naturalmente, si los integrantes del Tribunal siguieran ciegamente, sin ulterior estudio y análisis, la recomendación que le hace el Panel Central.

¿Qué diferencia habría entre este *mecanismo*, del Panel Central, establecido por el Tribunal con el propósito de actuar mejor informado en su función decisoria relativa a la expedición, o no, de recursos discrecionales y el *mecanismo* del que hablamos, el cual resultaría de ayuda en el proceso decisorio adjudicativo? La única diferencia fundamental que existe lo es, *naturalmente*, que el mecanismo propuesto *resultaría ser uno aún más valioso y efectivo por cuanto el mismo estaría integrado, de manera individual, por abogados de muchos años en la práctica de la profesión que tienen experiencia, en su condición de jueces, en la evaluación de unos hechos, el análisis de las controversias planteadas, y la correcta aplicación del derecho.*

(8) La participación de estos jueces bajo el esquema propuesto por nosotros —consistente en la preparación *individual* de un informe objetivo para el beneficio decisorio de este Tribunal, informe que tendría como base el análisis jurídico del expediente del caso a la luz de las alegaciones y señalamientos de las partes, la correspondiente investigación jurídica, y la aplicación del derecho a los hechos del caso— ciertamente sería parte integrante de; y constituiría una valiosa aportación a la función judicial de este Tribunal; foro judicial que tiene la *responsabilidad última* de interpretar la Constitución y las leyes del Estado Libre Asociado de Puerto Rico.

(9) En este caso *Negrón Soto v. Gobernador*, ante, pág. 667, este Tribunal —por voz del Juez Asociado Señor Negrón García— expresó, en lo pertinente, que "históricamente se ha reconocido la facultad del Juez Presidente para administrativamente relevar temporalmente a un juez de sus funciones judiciales y asignarle encomiendas especiales en distintos aspectos relacionados con la administración de [la]

Si es constitucional y propio que el Juez Presidente de este Tribunal le asigne, de manera individual, tareas *no* judiciales a los integrantes del Tribunal de Primera Instancia, no es posible, entonces, que sea inconstitucional e impropio que el Tribunal designe, como comisionados especiales *individuales*, a los jueces del extinto Tribunal de Apelaciones. El Tribunal Supremo es, después de todo, el cuerpo rector de la Rama Judicial.

En resumen, *no* tenemos duda alguna sobre el poder y la autoridad de este Tribunal para —al amparo de lo dispuesto por la citada Sec. 4 del mencionado Art. V de la Constitución, la cual lo faculta para funcionar bajo reglas de su propia adopción— asignarle, *de manera individual y entre otras labores*, funciones de comisionado especial a cualquiera de los integrantes del extinto Tribunal de Apelaciones.

## IV

*¿Por qué, entonces, nuestro disenso?* Llana y sencillamente debido a que en el día de hoy una mayoría de los integrantes de este Tribunal —utilizando el subterfugio de la creación de una *Unidad Especial de Jueces de Apelacio-*

---

justicia u obligaciones del primero.

A renglón seguido, y en el Esc. Núm. 3, el compañero Juez Negrón García, como ilustración de lo antes citado, hizo constar:

"(3)A manera de algunos ejemplos: asignaciones de jueces como Funcionarios Ejecutivos para auxiliar al Juez Presidente como miembro de la Junta Constitucional de Revisión de Distritos Electorales, Senatoriales y Representativos (Designaciones fechadas 10 de abril de 1963 y 8 de junio de 1971); Secretario del Consejo sobre la Reforma del Sistema de Justicia (7 de mayo de 1973); y Director Administrativo Auxiliar de los Tribunales (6 de diciembre de 1977). Nótese que estas instancias presentan como características comunes: (a) son designaciones temporales del Juez Presidente; (b) se relacionan con asuntos u obligaciones de éste o la administración de la justicia; (c) no existe incompatibilidad ética entre el cargo de juez y la asignación especial; y (d) el juez continúa *dentro* de la Rama Judicial, pero suspendidas sus funciones judiciales.

*"Bajo la estructura constitucional vigente, plantearían serias interrogantes de legalidad e incompatibilidad el que se pretendiera que un juez ocupara un cargo creado por ley fuera de la Rama Judicial y nombrado por los otros dos poderes."* (Énfasis suplido y en el original.) Íd., págs. 667–668.

*nes* y en abierta violación no sólo de la Constitución de Puerto Rico sino que de la clara política pública establecida por la Asamblea Legislativa en la citada Ley Núm. 11— *administrativamente perpetúa al Tribunal de Apelaciones,* no obstante éste haber sido suprimido por la Legislatura mediante la aprobación de la referida Ley Núm. 11.

Dicha *actuación administrativa,* de parte de la mayoría de los integrantes del Tribunal, no sólo constituye un claro desafío a las otras dos Ramas de nuestro Gobierno sino que es una inconstitucional y ultra vires por la cual, en nuestra opinión, los miembros del Tribunal que la suscriben pueden, inclusive, ser responsabilizados en relación con los cuantiosos desembolsos de fondos públicos que requiera la creación, y funcionamiento, de la llamada "Unidad Especial de Jueces de Apelaciones"; acción que merece el más enérgico y severo repudio de todos.

Nótese que *no* se trata de la válida designación, *de manera individual,* de un integrante de la Rama Judicial como comisionado especial para entender, *de manera preliminar,* en un caso o asunto particular ante la consideración de este Tribunal. *Se trata, a todos los fines prácticos, de la creación de un tribunal o foro judicial de facto por parte de este Tribunal,* para lo cual ciertamente la única Rama de nuestro Gobierno que tiene autoridad constitucional lo es la Asamblea Legislativa de Puerto Rico. Véase Sec. 2 del Art. V de la Constitución de Puerto Rico, *supra.*

Un examen somero de la resolución aprobada por el Tribunal, creadora de la referida unidad, revela, en primer lugar, que la "unidad o tribunal" contará con una "subsecretaría", un "alguacil general", y "el personal auxiliar necesario que determine el Juez Presidente para su eficiente operación". Véase Regla 4 de la Resolución de 1ro de diciembre de 1993. Por otro lado, los integrantes de dicha "unidad o tribunal" funcionarán bajo la supervisión de un "juez coordinador", o administrador, y en "paneles de no más de tres jueces", a ser designados los mismos por el

Juez Presidente de este Tribunal. Véase Reglas 4 y 6 de la citada resolución. Los miembros de los paneles de dicha "unidad o tribunal" rendirán un "informe", con "un resumen de los hechos y análisis del derecho aplicable que será notificado a las partes por la Subsecretaría de la Unidad Especial"; partes que tendrán un término para presentar sus objeciones al referido "informe". Véase Regla 9 de la referida resolución. Por último, y para disipar cualquier duda, los integrantes de esta "unidad o tribunal" —todos miembros del extinto Tribunal de Apelaciones— estarán ubicados en el décimo piso del Centro Judicial de San Juan. Véase Regla 10 de la citada resolución. *Como, en ocasiones, cándidamente expresan algunos astutos productores de películas de supuesta ficción, "cualquier semejanza con hechos reales ocurridos, es pura coincidencia".*

V

No creemos que persona alguna pueda tener duda *respecto a que el propósito y el efecto neto, o práctico, de la acción tomada en el día de hoy por el Tribunal lo es la perpetuación, o creación, administrativa del suprimido Tribunal de Apelaciones*; acción que, repetimos, conflije con las disposiciones de la Sec. 2 del Art. V de nuestra Constitución, *supra*, y con la clara política pública establecida por la Asamblea Legislativa al aprobar la citada Ley Núm. 11; estatuto mediante el cual *se suprimió* el Tribunal de Apelaciones. *Ahora bien*, aún asumiendo —a los fines de la argumentación— que dicha acción no fuera una ilegal, *la misma es impropia y objetable.*

Podemos tomar conocimiento judicial de la *insatisfacción de nuestros conciudadanos* con la forma y manera en que se tramitan, y solucionan, los casos ante nuestros tribunales de instancia. *En específico, debe señalarse y aceptarse que el promedio de tiempo que toma un caso, civil o criminal, en resolverse es uno totalmente inaceptable.* Ello,

conforme encuestas realizadas, *ha sido una queja, y señalamiento, constante de nuestra ciudadanía.*

Por años, los integrantes de la Rama Judicial de Puerto Rico han *intentado* defenderse de dichos válidos señalamientos aduciendo, como excusa: la falta de fondos; la escasez de personal, a todos los niveles de la Rama Judicial; y, en particular, el reducido número de jueces con que contamos para resolver los cientos de miles de casos pendientes de resolución final ante los tribunales del País.

*¡Que oportunidad tan preciosa* —de resolver parcialmente o de aliviar dicha problemática— *se desperdicia en el día de hoy!* Meramente a manera de ejemplo, ¿acaso no se ha pensado que esos catorce (14) jueces —que hoy se designan, en paneles de tres, para actuar como oficiales jurídicos— podrían ser utilizados, y aprovechados, a nivel del Tribunal Superior para sustituir y relevar de sala, por un período de tiempo, a los recargados jueces de dicho foro judicial con el propósito de que éstos puedan resolver los casos que tienen sometidos hace algún tiempo?

Para hacer, y rendir un informe sobre los méritos de un caso ante este Tribunal, ¿que necesidad hay de que sean *tres* jueces? ¿Acaso ese informe no puede ser hecho por un sólo juez? ¿Qué necesidad hay de que esos jueces sean ubicados, todos juntos, en "el décimo piso del Centro Judicial de San Juan"? ¿Qué necesidad hay de que esa "unidad" tenga un "juez coordinador" y cuente con los servicios de una "subsecretaría", un "alguacil general" y todo el "personal auxiliar" que sea necesario? ¿Acaso la Rama Judicial y la Administración de Tribunales —*que siempre se están quejando de la falta de fondos para implementar nuevos programas y mejorar los existentes, reclutar nuevo personal, y aumentarle el sueldo a los empleados de dicha rama*— tienen ahora tanto dinero disponible como para crear, y sufragar, un innecesario tribunal apelativo de facto con todo el inmenso gasto de fondos públicos que ello conlleva? *¿Qué necesidad hay de gastar, o malgastar, todo ese*

*dinero?* El mismo, *¿no puede ser mejor utilizado en otras áreas de la administración de la justicia?*

Si la creación por la Asamblea Legislativa de Puerto Rico, en el ejercicio válido de sus prerrogativas constitucionales, del Tribunal de Apelaciones era, *y resultó*, innecesaria, ¿cómo se puede justificar la actuación, inconstitucional y ultra vires, de la mayoría del Tribunal de crear, y perpetuar, administrativamente dicho tribunal de apelaciones? *La Rama Judicial no puede, ni debe, ser manejada como la "finca privada" de este Tribunal. La misma pertenece al pueblo de Puerto Rico.* Los integrantes de este Tribunal son los fiduciarios que tienen la responsabilidad de cuidar, y mantener, la misma en condiciones óptimas. Algún día se tendrá que rendir cuentas por la acción tomada hoy por la mayoría del Tribunal.

— O —

Opinión concurrente y disidente emitida por la Juez Asociada Señora Naveira de Rodón.

Estamos de acuerdo en que la adopción y promulgación de las Reglas para la Creación y Funcionamiento de la Unidad Especial de Jueces de Apelaciones es un ejercicio válido de la autoridad de este Tribunal. Esta se fundamenta en nuestra facultad inherente para reglamentar los procedimientos judiciales, en lo dispuesto en la Regla 50 del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. I–A, y en la Sec. 13 del Art. V de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1. Sin embargo, discrepamos de la manera en que se ha ejercido esta autoridad, particularmente en cuanto a la composición y el funcionamiento de la Unidad Especial de Jueces de Apelaciones (en adelante Unidad Especial). Por esta razón emitimos esta opinión.

En primer lugar, la Regla 3 dispone que únicamente los jueces de apelaciones podrán ser miembros de la Unidad

Especial. Ésta ha sido creada como un instrumento de ayuda al Tribunal Supremo. Su propósito es asistirle en aquellas tareas que le sean encomendadas. Véase Regla 5. No encontramos razón alguna para limitar el universo de personas que puedan ser nombradas para servir en este cuerpo. El Tribunal Supremo, al amparo de la citada Regla 50 de su Reglamento,[1] y el Juez Presidente, en virtud de su función constitucional de dirigir la administración de los tribunales,[2] pueden encomendarle las funciones que dispone la mencionada Regla 5 a cualquiera de los jueces que forma parte del Tribunal General de Justicia. Consideramos que restringir la participación en la Unidad Especial a los jueces de apelaciones no constituye el más sabio ejercicio de esta facultad. Por el contrario, la participación en la Unidad Especial debería estar abierta a cualquier juez que pertenezca al Tribunal General de Justicia, y que, a esos efectos, fuese nombrado por el Juez Presidente. Entendemos que el Reglamento de nuestro Tribunal debe proveer esta flexibilidad para viabilizar, así, la mejor utilización de los recursos disponibles.

En segundo lugar, discrepamos de la forma en que va a funcionar la mencionada Unidad Especial. La Regla 6 establece que:

> [l]os jueces de apelaciones, en atención a las funciones o tareas judiciales que se les asignen, funcionarán individualmente *o en paneles de no más de tres jueces*, por determinación del Juez Presidente.
>
> El Juez Presidente nombrará los paneles y el Presidente de cada panel; establecerá el término de su duración; y determinará el sistema de asignación de asuntos a los paneles en forma

---

[1] *"En situaciones no previstas por este Reglamento el Tribunal encauzará el trámite en la forma que a su juicio sirva los mejores intereses de todas las partes.*
Queda reservada la facultad del Tribunal para en casos apropiados prescindir de términos, escritos o procedimientos específicos en orden al más justo y eficiente despacho del caso." (Énfasis suplido.) 4 L.P.R.A. Ap. I–A.

[2] La Ley de la Judicatura dispone sobre el particular que "[e]l Juez Presidente dirigirá la administración del Tribunal General de Justicia y será responsable del funcionamiento eficiente de sus varias salas y secciones y *de la pronta resolución de los pleitos*". (Énfasis suplido.) 4 L.P.R.A. sec. 301.

automática rotativa, siguiendo el orden de referimiento de asuntos, que deberá implantar el Juez Coordinador de la Unidad Especial. (Énfasis suplido.)

Una vez considerado el caso, asunto o procedimiento judicial referido, "los jueces de apelaciones preparan un informe con un resumen de los hechos y análisis del derecho aplicable que será notificado a las partes...." Regla 9A. La Regla 9B dispone que las partes podrán presentar al Tribunal Supremo sus objeciones al informe, dentro del término que allí se les concede. Finalmente, señala la Regla que "[e]l Tribunal Supremo, atendidos los señalamientos de las partes, si los hubiere, *adoptará, modificará o no dará curso a dicho informe*, mediante la resolución o el dictamen que estime procedente". Regla 9B.

Del examen de este esquema de funcionamiento podemos colegir que el informe presentará un análisis y evaluación preliminar del caso, cuyo propósito es ser un instrumento de ayuda en el proceso de evaluación y adjudicación del Tribunal Supremo. Por lo tanto, éste no constituirá una adjudicación del caso o asunto tratado.

El informe será un documento adicional a ser considerado por este Tribunal al hacer su adjudicación del caso. No albergamos duda de que nos será de gran utilidad. La excelente labor que han desempeñado los jueces de apelaciones es garantía de esto.

Por razón de la naturaleza no adjudicativa de las funciones delegadas a los jueces de la Unidad Especial, creemos que no es necesario su funcionamiento en paneles. Recurrir al uso de los paneles está justificado cuando éstos se utilizan para descargar funciones adjudicativas, porque así se permite el intercambio de ideas entre sus componentes a fin de enriquecer el proceso evaluativo para la decisión final del caso. También se han utilizado para desempeñar funciones de supervisión de planes destinados a generar cambio social, *e.g.*, programas para adelantar la desegregación en los distritos escolares. Véanse: *Morgan v. Kerri-*

*gan*, 523 F.2d 917, 919 (1er Cir. 1975); *Bradley v. Milliken*, 345 F. Supp. 914, 916–917 (D. Minn. 1972). Estas no son el tipo de funciones que, en virtud de las citadas reglas, le serán encomendadas a los jueces de la Unidad Especial. Por lo tanto, no hemos encontrado, ni anticipamos, razón alguna para que los componentes de la Unidad Especial ejerzan sus funciones a través de paneles.

Por el contrario, el plan de funcionamiento más acorde y adecuado a las tareas delegadas a los jueces de la Unidad Especial es la consideración individual de cada asunto por un juez y no por un panel. Este funcionamiento es más a fin con el propósito de la Unidad Especial de ayudarnos a lograr una adjudicación más expedita de los casos. De igual manera, constituye una mejor y más eficiente utilización de los valiosos recursos humanos que se desempeñarán en la mencionada unidad. La ya sobrecargada Rama Judicial no puede darse el lujo de utilizar tres jueces para realizar el trabajo que eficientemente puede llevar a cabo uno solo.[3]

Por las razones antes expuestas, aunque estamos de acuerdo en que tenemos la autoridad para promulgar las reglas que hoy adopta la mayoría, disentimos de la forma en que ésta se ha ejercitado al estructurar la composición y el funcionamiento de la Unidad Especial de Jueces de Apelaciones.

---

[3] Dada las funciones limitadas de la Unidad Especial de Jueces de Apelaciones y el hecho de que toda moción o solicitud relacionada con los casos o asuntos remitidos a dicha unidad tendrá que ser presentada ante el Tribunal Supremo, quien resolverá lo que estime pertinente, considero totalmente innecesaria la creación de una Subsecretaría para intervenir con "la tramitación de todos los casos, procedimientos o asuntos que se le refieran, un alguacil general y demás personal". Regla 4. Los escasos recursos que tiene disponible la Rama Judicial pueden ser mejor utilizados para remediar algunos de sus graves problemas.

## – O –

Opinión disidente del Juez Asociado Señor Negrón García.

Más de un cuarto de siglo dedicados entera y vocacionalmente a impartir justicia, y la trascendencia del asunto, nos obligan en recta conciencia a disentir[1] de la aprobación de las Reglas para la Creación y Funcionamiento de la Unidad Especial de Jueces de Apelaciones (en adelante Reglas).

Su promulgación por la mayoría del Tribunal constituye una actuación *inconstitucional* y *ultra vires, contraria* a la Ley Núm. 11 de 2 de junio de 1993 que *suprimió* el Tribunal de Apelaciones. Su implantación *lesionará* irreversiblemente el proceso deliberativo-decisorio interno y la imagen de laboriosidad y autoestima de este Tribunal, de los jueces del derogado Tribunal de Apelaciones y de los Jueces del Tribunal Superior. Posee el potencial de desencadenar un *choque* con los poderes Ejecutivo y Legislativo. Además, infringe derechos y prerrogativas *fundamentales* de jueces, acusados, Pueblo de Puerto Rico y litigantes en el área de la justicia apelativa.

El propósito *inmediato* anunciado públicamente por el Juez Presidente, Honorable Señor Andréu García, es que los jueces del extinto Tribunal de Apelaciones —*ahora en paneles de tres (3) con la rúbrica de Comisionados Especiales*— intervengan en "*cualquier* caso, asunto o procedimiento ante [la] consideración" de este Tribunal Supremo, rindiéndonos un "Informe" con un "*resumen* de los hechos y análisis del derecho *aplicable*" que no es otra cosa que una

---

[1] En un tribunal colegiado, en que existen juristas de espíritus libres y pluralidad de criterios, "cuando un juez percibe que una interpretación del texto se ha apartado tanto de su verdadero significado, un deber constitucional de mayor envergadura lo obliga a exponer esa desviación y a señalar un derrotero distinto". (Traducción nuestra.) W.J. Brennan, *Discurso ante Asociación Abogados Criminalistas Nueva York*, 1990.

Así entendido, este disenso responde a esta dinámica tradicionalmente imperante en el seno del Tribunal, cuyo propósito esencial es iluminante, *jamás intimidante*.

adjudicación *inicial* en los *méritos*. Ello presupone una ponencia debidamente fundamentada y, lógicamente, por necesidad, una evaluación del récord, de los autos originales, alegatos y señalamientos de las partes. Una vez notificada, las partes podrán presentar ante este Tribunal Supremo sus objeciones. Conlleva que los Jueces de Apelaciones continúen interviniendo directamente en los trámites de adjudicación en sus méritos de los recursos que quedaron pendientes el 31 de agosto, fecha en que desapareció dicho tribunal *y en otros más. Esa encomienda no es constitucional ni legalmente viable.*

## I

Sabido es que constitucionalmente el Sistema Judicial puertorriqueño se compone de "un Tribunal Supremo, y *por aquellos otros tribunales que se establezcan por ley".* (Énfasis suplido.) Art. V, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 355. A renglón seguido, la Sec. 2 del mismo Art. V, en lo pertinente, dispone que "[l]a Asamblea Legislativa, en cuanto no resulte incompatible con esta Constitución, podrá *crear* y *suprimir* tribunales, con excepción del Tribunal Supremo, y *determinará* su *competencia y organización".* (Énfasis suplido.) Const. E.L.A., *supra,* pág. 355.

Al elevarse el Tribunal Supremo a rango constitucional y distribuirse de este modo los poderes, *se intentó evitar una alta concentración tanto en la Asamblea Legislativa como en la Rama Judicial (Tribunal Supremo), sin menoscabarse la independencia judicial.* Sobre el particular, el legajo de la Asamblea Constituyente, por voz del delegado Lcdo. José Trías Monge, revela que *no* se estimó "necesario, para la garantía de la independencia del poder judicial, el que se señale rígidamente y se consagre, *la existencia de todo tribunal en la constitución.* Más bien se han inclinado los comentaristas al particular, en relación con articulados

como éste, a recomendar que se limite más bien el poder constituyente a señalar al tribunal de última instancia, y a permitir *la flexibilidad necesaria para la creación de los otros componentes del poder judicial*". (Énfasis suplido.) 1 Diario de Sesiones de la Convención Constituyente 463.

Elaborando un poco más en estos conceptos, y aclarando para el récord que la Asamblea Legislativa *exclusivamente* retenía las facultades antes señaladas, el delegado Lcdo. Víctor Gutiérrez Franqui explicó:

> Entendemos que esta cosa de la *separación de poderes* —y es bueno que esto *se haga claro*— y de la *independencia judicial no quiere decir que nosotros estemos obligados a hacer una constitución ahora en que la Asamblea Legislativa ya no pueda hacer nada más en Puerto Rico*. Se acabó la legislatura. Se acabó el [poder] ejecutivo. Y lo que queda es el Tribunal Supremo. *Eso no* es independencia judicial ni eso es separación de poderes. Separación de poderes es que cada rama del gobierno se ajuste a bregar con aquellos aspectos de la organización política que son de su incumbencia. ...
> *Aquí se dispone, claramente y en palabras que no dejan lugar a dudas*, que el Tribunal Supremo de Puerto Rico será el tribunal *de última instancia*. Se *dispone asimismo* que en materia de jurisdicción el Tribunal Supremo y los demás tribunales de Puerto Rico constituirán un sistema integrado y que *solamente podrá intervenir la Asamblea Legislativa en cuestiones de competencia*.
> Eso quiere decir que está fuera del alcance de la Asamblea Legislativa de Puerto Rico la jurisdicción del Tribunal Supremo. *Lo que está a su alcance es la competencia*. Y quiere decir además, al estipular esta proposición que nosotros hemos traído, que el Tribunal Supremo de Puerto Rico será el tribunal de última instancia, que la Asamblea Legislativa no podrá impedir que los casos judiciales en alguna forma o en otra, lleguen hasta la consideración del Tribunal Supremo. Esto es lo que quiere decir que será el tribunal de última instancia. Y cuando se dice que la Asamblea Legislativa puede reorganizar y abolir tribunales, *se dice en forma no incompatible con las disposiciones de esta constitución; que quiere decir* que lo que haga nunca podrá privar al Tribunal Supremo de su condición de tribunal de última instancia. (Énfasis suplido.) 1 Diario de Sesiones, *supra*, págs. 591–592.

Teniendo presente estos antecedentes, a modo de breve

repaso, recordamos que *competencia* es la "[a]ptitud de una autoridad pública para otorgar actos jurídicos. ... la *competencia de un tribunal o corte* ... significa el *poder reconocido a una jurisdicción para instruir y juzgar un proceso*". (Énfasis suplido.) H. Capitant, *Vocabulario Jurídico*, Buenos Aires, Eds. Depalma, 1961, pág. 132. Dicho de otro modo, es la "[a]tribución *legítima a un juez* u otra autoridad *para el conocimiento o resolución de un asunto.* Couture la define como medida de jurisdicción asignada a un órgano del Poder Judicial, a efectos de la determinación genérica de los asuntos en que es llamado a conocer por razón de la materia, de la cantidad y del lugar". M. Ossorio, *Diccionario de Ciencias Jurídicas, Políticas y Sociales*, Buenos Aires, Ed. Heliasta, 1984, pág. 139. Como dijimos recientemente, "[c]ompetencia es 'la manera en que se organiza, se canaliza el ejercicio de la jurisdicción que tiene el tribunal'. M.A. Velázquez Rivera, *Jurisdicción y competencia de los tribunales de Puerto Rico*, 48 (Núm. 1) Rev. Jur. U.P.R. 27, 29 (1979). De otra parte, las *reglas de competencia* son las que establecen la ordenada tramitación de los asuntos judiciales dentro de nuestro sistema de jurisdicción unificada. Regla 3 de Procedimiento Civil, 32 L.P.R.A. Ap. III; Ley de la Judicatura del Estado Libre Asociado, Ley Núm. 11 de 24 de julio de 1952, según enmendada, 4 L.P.R.A. secs. 61 y 62; Art. V, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1". (Énfasis suplido y en el original.) *Lemar S.E. v. Vargas Rosado*, 130 D.P.R. 203 (1992).

Cónsono con ese diseño constitucional, mediante la Ley Núm. 11 de 8 de agosto de 1974 (4 L.P.R.A. sec. 37), los poderes Ejecutivo y Legislativo instituyeron la *Sección Apelativa del Tribunal Superior.* Esa *Sección Apelativa* fue derogada al crearse el *Tribunal de Apelaciones* mediante la Ley Núm. 21 de 31 de julio de 1992. Finalmente, *este año* la Ley Núm. 11 de 2 de junio de 1993 suprimió el referido *Tribunal de Apelaciones.* La lección constitucional es clara: del mismo modo que la *Sección Apelativa* y el *Tribunal de*

*Apelaciones* fueron creados y expresamente se les dio competencia sobre algunos asuntos, *por legislación, así se les quitó y fueron suprimidos.*

Al respecto, el Art. 13 de la Ley Núm. 11 de 1993, *supra,* concedió a los jueces del Tribunal de Apelaciones suprimido, noventa (90) días para "resolver al máximo posible los asuntos pendientes ante su consideración". 1993 (Parte I) Leyes de Puerto Rico 32, 40. Una vez "[t]ranscurrido ese término, los recursos *pendientes* en el Tribunal de Apelaciones se transferirán al Tribunal Supremo conforme a lo dispuesto en el Artículo 9 de esta Ley". Íd. Por su parte, este último ordenó que "[l]os expedientes, casos y otros asuntos *pendientes* a la fecha de vigencia de esta ley ante el suprimido Tribunal de Apelaciones *pasarán a la consideración y atención del Tribunal Supremo para la acción correspondiente".* (Énfasis suplido.) Art. 9 de la Ley Núm. 11 de 1993, *supra,* Leyes de Puerto *Rico 39.*

Lo expuesto permite arribar a algunas importantes conclusiones. *Primero,* bajo nuestra Constitución la Asamblea Legislativa —"con flexibilidad necesaria"— es la *única* facultada para organizar, *crear* y suprimir *tribunales,* y para *establecer y fijar su competencia.* Véanse: *Ramírez v. Registrador,* 116 D.P.R. 541 (1985); *Pueblo v. Morcelo Martínez,* 104 D.P.R. 20, 23–24 (1975). *Segundo,* este Tribunal Supremo es el *único* foro apelativo de última instancia de génesis constitucional. *Tercero,* en la zona de la justicia apelativa, este peculiar linaje implica que, en *igualdad de condiciones y trámites,* cualquier persona afectada por un dictamen de un tribunal de primera instancia tiene derecho a tocar nuestras puertas y reclamar nuestra intervención directa apelativa, obligatoria o discrecionalmente. *Cuarto,* a nombre de la independencia judicial u otras razones —incluso la mejor utilización de los recursos humanos— este Tribunal Supremo *no* tiene facultad inherente ni está autorizado a variar ni modificar la "competencia [ni] organización" de los tribunales. *Quinto,* al usurpar este

Tribunal Supremo esas facultades legislativas, estamos ante un *cambio crucial* que necesariamente genera una alta concentración de poder en la Rama Judicial y *crea un desbalance dramático en el delicado sistema de pesos y contrapesos en que se apuntala nuestra Constitución. Sexto*, nos guste o no, mediante la Ley Núm. 11 de 1993, *supra*, y eliminación del Tribunal de Apelaciones, la Legislatura emitió un *mandato inequívoco y expreso dirigido* a asignar directamente a este Tribunal Supremo la consideración, atención y, claro está, la *adjudicación* de los asuntos que eran de la competencia del Tribunal de Apelaciones, lo cual resulta natural, toda vez que muchos recursos eran originalmente de nuestra *competencia* y algunos estaban sometidos ante este Foro. Otros, de no haber sido por la creación del Tribunal de Apelaciones, se hubieran presentan aquí también. *Séptimo*, en materia de *competencia*, "el ejercicio de tales poderes *no es facultativo, sino que es obligatorio. En el caso de los Jueces y Tribunales estamos ante la situación en que a la vez que se atribuye un poder se impone un deber.* Unidas a las normas que confieren poderes se encuentran normas que *imponen el deber de utilizar ese poder en una forma determinada*, con lo cual en este caso las 'razones operativas' son las normas que le imponen deberes, mientras que las 'razones auxiliares' son las normas procesales que determinan la formación de una sentencia válida". (Énfasis suplido.) F. López Ruiz, *Autoridad normativa y normas de competencia*, Año XLIX (Núm. 584) Rev. Gen. Der. 4347, 4357 (1993). Y *octavo*, el historial, debate y texto de la Asamblea Constituyente y la Ley Núm. 11 de 1993, *supra*, no pueden ser más diáfanos. No existe margen para negar sus efectos a la más fértil imaginación: nuestro sistema judicial está hoy *solamente* compuesto por un Tribunal Supremo y un Tribunal de Primera Instancia; este último dividido en tres (3) *competencias* denominadas Tribunal Superior, de Distrito y Municipal.

## II

No obstante la nitidez de este diseño constitucional y los preceptos legislativos, poco tiempo después de 31 de agosto, fecha en que expiró el plazo de noventa (90) días concedido por la Asamblea Legislativa al Tribunal de Apelaciones, la mayoría del Tribunal ha promulgado unas Reglas con el efecto neto de *crear* y extender ad perpétuam su vida y sus funciones.(²) Según indicado, se trata de una actuación *inconstitucional y ultra vires*, contraria al mandato expreso de la Legislatura, que *socava el importante principio constitucional de separación de poderes. Equivale a incrustar en nuestro sistema judicial un tribunal momificado.* Se pretende, de forma inaudita, prolongar el funcionamiento de un Tribunal Apelativo que nadie duda quedó suprimido el 31 de agosto de 1993 mediante legislación, según la Sec. 2 del Art. V de la Constitución, *supra.*

Tal y como a menudo ocurre cuando se violentan el espíritu, los parámetros constitucionales y la buena tradición, todo este frágil andamiaje se ancla en un complaciente espejismo: ni la Constitución (Art. V, Secs. 4, 7 y 13)(³), así como tampoco "el ordenamiento procesal vigente"

---

(²) La posibilidad, por excepción, de que se designen Comisionados Especiales a jueces que no forman parte del Tribunal de Apelaciones, o que su designación y encomienda sea *individual*, no supera las objeciones aquí expuestas.

Significaría que un Juez Superior, de Distrito o Municipal, teóricamente "podría" en el mañana ser así designado por el Tribunal Supremo. *No tenemos reparos para asuntos de jurisdicción original* pero, por los fundamentos expuestos en esta ponencia, sí para recursos apelativos ante nuestra consideración.

(³) Disponen:

"El Tribunal Supremo funcionará, bajo reglas de su propia adopción, en pleno o dividido en salas compuestas de no menos de tres jueces. Ninguna ley se declarará inconstitucional a no ser por una mayoría del número total de los jueces de que esté compuesto el tribunal de acuerdo con esta Constitución o con la ley." Art. V, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 356.

"El Tribunal Supremo adoptará reglas *para la administración de los tribunales las que estarán sujetas a las leyes relativas a suministros, personal, asignación y fiscalización de fondos y a otras leyes aplicables en general al gobierno.* El Juez Presidente dirigirá la administración de los tribunales y nombrará un director administrativo, quien desempeñará su cargo a discreción de dicho magistrado." (Énfa-

(Regla 41.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III) leídas aislada o integralmente, son fuente de poder legítimo que apoyen el proceder mayoritario.

Ni el Juez Presidente, como máximo jerarca administrativo, ni este Tribunal en sus respectivas prerrogativas de adoptar reglas para asuntos administrativos, podemos actuar contra disposiciones constitucionales y legales expresas. Las Secs. 4, 7 y 13 del Art. V de la Constitución antes transcritas están sujetas a su propio lenguaje. Nuestras reglas de funcionamiento no pueden contravenir la propia Constitución, y las de administración no son susceptibles de interpretarse como de mayor jerarquía que las leyes promulgadas por la Asamblea Legislativa.

La Sec. 13 del Art. V de nuestra Constitución, *supra*, autoriza al Juez Presidente a asignar *"funciones judiciales"* a jueces de tribunales, salas o secciones eliminadas. No cuestionamos seriamente esa facultad, pero ciertamente no puede utilizarse para, vía Reglas y a título de *Comisionados Especiales*, conferirle a unos jueces *intervención y competencia* sobre recursos, casos y asuntos que previamente la Legislatura, válida y *expresamente, les retiró y otorgó exclusivamente al Tribunal Supremo*. Bajo esa disposición constitucional, la proyección de que el Juez Presidente asigne los jueces del suprimido Tribunal de Apelaciones a funciones judiciales, *se detiene ante las puertas de este Tribunal Supremo; como jueces, directa ni indirectamente pueden intervenir en los mismos.*

La aplicabilidad y pertinencia de la citada Sec. 13 del Art. V de nuestra Constitución es irrefutable, pues el *único facultado para asignar "funciones judiciales" a estos jueces es el Juez Presidente. Es un error afirmar que quien los asigna es, reglamentariamente, el Tribunal.*

sis suplido.) Art. V, Sec. 7, Const. E.L.A., *supra*, pág. 360.

"De modificarse o eliminarse por ley un tribunal o una sala o sección del mismo, la persona que en él ocupare un cargo de juez continuará desempeñándolo durante el resto del término por el cual fue nombrado, y ejercerá aquellas *funciones judiciales que le asigne* el Juez Presidente del Tribunal Supremo." (Énfasis suplido.) Art. V, Sec. 13, Const. E.L.A., *supra*, pág. 361.

Merece enfatizarse que esa disposición se ha activado ahora, por primera vez, debido a la derogación del Tribunal de Apelaciones. *No cabe, pues, invocar precedente judicial analógico alguno.* Los relevos del pasado, realizados por los anteriores Jueces Presidentes, fueron administrativos y no recayeron *nunca* en jueces de tribunales suprimidos, cubiertos por la protección constitucional *especial* de la Sec. 13 del Art. V de nuestra juventud. Y es que esa disposición constitucional, si bien genera una prerrogativa que pertenece al Juez Presidente, les da a los jueces del tribunal eliminado *un importante derecho*, esto es, *son acreedores y pueden exigir* que se les asigne en *"funciones judiciales" reales* y no en encomiendas análogas a las de un Comisionado Especial, Oficial Jurídico o una combinación de ambos, *en las que están ausentes el acto culminante de una verdadera función judicial: el iuditium, esto es, dictar sentencia.* Hacerlo es olvidar los cinco (5) elementos clásicos integrantes de la función judicial legítima (jurisdiccional y competencia), los cuales —siguiendo los pasos procesales en que se desarrollan— son *notio, vocatio, coertio, iuditium* y *executio.*[4]

Como veremos, la promulgación de estas Reglas susci-

---

[4] "(a) *Notio* — Es la aptitud judicial de conocer en el asunto de que se trate, de conocer en la causa; aptitud imprescindible, indiscutible, porque el juez, como todo el mundo, debe actuar *con conocimiento de causa.* Puesto que se ha de ver en la obligación de dictar sentencia, de producir ese acto culminante de su función que se llama *sentencia,* se debe poner en sus manos las facultades necesarias para adquirir esa noción. De esta necesidad, derivan las *posibilidades instructoras* del juez, que las leyes reconocen y regulan, sea para actuar directamente en la adquisición de las probanzas, o para atender los requerimientos probatorios de las demás personas interesadas en el proceso." M.A. Orderigo, *Lecciones de Derecho Procesal,* Buenos Aires, Ed. Depalma, 1985, págs. 215-216. "(b) *Vocatio* — Es la aptitud de convocar a las partes, de llamarlas, de ligarlas a la empresa procesal, sometiéndolas jurídicamente a sus consecuencias." Íd., pág. 219. "(c) *Coertio* — Es la aptitud de disponer de la fuerza para obtener el cumplimiento de las diligencias decretadas durante la tramitación del proceso." Íd., pág. 221. "(d) *Iuditium* — Es la aptitud de dictar la sentencia definitiva que decida el conflicto; la aptitud judicial más importante, porque se refiere al acto de juicio hacia el cual se encamina toda la actividad procesal, del juez y de las partes, y de sus respectivos auxiliares." Íd. "(e) *Executio* — Igualmente que la coertio, la executio consiste en la aptitud judicial de recurrir a la fuerza; pero se diferencia de aquélla en que se refiere a la fuerza necesaria para el cumplimiento de la sentencia definitiva, y no a las diligencias decretadas durante el desarrollo del proceso." Íd.

tan demasiadas interrogantes sobre su validez. No está claro ni definido el papel de los jueces apelativos: ¿se desempeñarán como jueces?; ¿Comisionados Especiales?; ¿Oficiales Jurídicos?; ¿Una combinación o híbrido? A primera vista, según la Regla 9 y la etiqueta de *Comisionados Especiales*, los "análisis de derecho aplicable" de esos jueces, en contraste con el "resumen de los hechos", ¿gozarán ante el Tribunal que los nombró (en este caso el Tribunal Supremo), la misma deferencia y valor adjudicativo? Argumentar en contrario, ¿no sería un contrasentido, pues de un lado a priori devaluaría los "méritos" de sus *Informes* —menoscabando atributos intrínsecos y prerrogativas inherentes del cargo de juez— a la par que chocaría contra la Sec. 13 del Art. V de nuestra Constitución, *supra*, que sólo permite al Juez Presidente asignarlos a "funciones judiciales" legítimas?

"La persona que cuenta con un nombramiento de juez dado por la autoridad competente y que ha prestado juramento en legal forma, tiene capacidad para desempeñar la función judicial en un número indeterminado de procesos, tiene aptitud genérica para ejercer la jurisdicción; pero, *para ejercerla en concreto, con relación a procesos determinados, también precisa legitimidad, precisa ser el juez cuya intervención la ley ha indicado con relación al caso, lo cual depende de que sea competente* y de que no se halle en ninguna de las situaciones que, tornándolo sospechoso de parcialidad, impongan su excusación y autoricen a las partes a recusarlo." (Énfasis suplido.) M.A. Oderigo, *Lecciones de Derecho Procesal*, Buenos Aires, Ed. Depalma, 1985, págs. 133–134.

*Cualesquiera que sean las contestaciones, nos negamos convertir a los jueces del Tribunal de Apelaciones en simples Comisionados Especiales u Oficiales Jurídicos. Para nosotros continúan siendo jueces, cualidad que explica por qué si la Asamblea Legislativa en el futuro restaurara dicho Tribunal de Apelaciones o creara uno intermedio —con*

*la función de revisar los tribunales de primera instancia—
estos jueces incuestionablemente podrían reclamarle al
Juez Presidente que fueran asignados prioritariamente a
ese nuevo foro apelativo.* Véase Historial del Diario de Se-
siones, *supra*, págs. 463–464; 1697–1700.

## III

Excluidas como fuentes de autoridad esas tres (3) dispo-
siciones constitucionales —y, claro está, la propia Ley
Núm. 11 de 1993, *supra*— notamos que el lenguaje de la
Regla 7(A), en lo esencial, incorpora el de la Regla 41.2 de
Procedimiento Civil, *supra*. La misma tampoco es funda-
mento legal, pues su específico e histórico propósito no
puede quedar más distante para el cual ahora se recluta.

El uso de un Comisionado Especial en el Tribunal Su-
premo, al amparo de la citada Regla 41.2, tradicional y
reglamentariamente *se ha circunscrito* a asuntos y casos
de *jurisdicción original*, tales como trámites de querellas
disciplinarias contra abogados y jueces (Regla 13 del Re-
glamento del Tribunal Supremo de Puerto Rico, 4 L.P.R.A.
Ap. I–A) y casos de incapacidad mental de abogados (Regla
13.1 del Reglamento del Tribunal Supremo de Puerto Rico,
*supra*). También podría usarse en hábeas corpus, *manda-
mus, quo warranto* y auto inhibitorio. Regla 14 del Regla-
mento del Tribunal Supremo de Puerto Rico, *supra*.

En esa capacidad, el Comisionado Especial recibe la
prueba testifical y documental, y oportunamente nos rinde
un informe en el cual hace constar sus determinaciones de
hecho a la luz de una evaluación *directa y de dirimir la
credibilidad* de los testimonios. *Jamás hemos utilizado
uno o varios paneles de Comisionados Especiales para in-
tervenir en el proceso de adjudicar en sus méritos recursos
apelativos de revisión, certiorari o apelaciones; máxime
para "resumirnos" los hechos de testimonios prestados, re-
cibidos y aquilatados en juicios plenarios y evidenciarios*

*por otros jueces de primera instancia en el ejercicio del atri-*
*buto inherente más importante de sus cargos judiciales, el*
*iuditium.*

El malabarismo jurídico mayoritario llega al extremo de extender un cordón umbilical de ilegítima fuente en el lenguaje de la Regla 41.2 de Procedimiento *Civil, supra,* para atender también las apelaciones, los *certiorari* y otros asuntos de lo *criminal* que quedaron pendientes en el Tribunal de Apelaciones. *Sin seguirse el trámite constitucional* de remisión a la Asamblea Legislativa pautado en la Sec. 6 del Art. V de nuestra Constitución, *supra,* han enmendado las Reglas de Procedimiento *Criminal vigentes* y han creado la figura del *Comisionado Especial apelativo en casos penales,* menoscabando de ese modo los derechos sustantivos de los acusados y del Pueblo.

Verdaderamente, por arte de magia, estamos ante un monumental *non sequitur.* Ni este Tribunal, así como tampoco la Legislatura en 1979, consideraron que *bajo la sombra de la Regla 41.2 de Procedimiento Civil, supra —menos bajo la Regla 50 de nuestro Reglamento, 4 L.P.R.A. Ap. I-A— pudiera crearse y sostener todo un Tribunal de Apelaciones (Comisionados Especiales) o edificar un frágil alero al Tribunal Supremo.*

## IV

Es elemental el principio que el *nombre o etiqueta no hace la cosa ni le da sabor. Lo importante es el contenido y la sustancia.* Así sucede con la llamada *Unidad Especial de Jueces de Apelaciones* (Comisionados Especiales). Desprovista de su ropaje y encaje nominal, en lo esencial vemos simplemente un intento de resucitar al extinto Tribunal de Apelaciones. Así aflora de una rápida ojeada de su nomenclatura y trámites, según demostramos en la tabla de equivalencias que hemos confeccionado:

| TRIBUNAL DE APELACIONES SUPRIMIDO POR LA ASEMBLEA LEGISLATIVA, SEGÚN SEC. 2, ART. V, CONSTITUCIÓN | UNIDAD ESPECIAL DE JUECES DE APELACIONES CREADO |
|---|---|
| 1. Título: Tribunal de Apelaciones | Unidad Especial de Jueces de Apelaciones |
| 2. Integrantes: Jueces de Apelaciones | Mismos Jueces de Apelaciones, ahora como *Comisionados Especiales* |
| 3. *Paneles* de tres (3) Jueces de Apelaciones | *Paneles* de tres (3) Jueces de Apelaciones |
| 4. Sistema de Rotación periódica por Tribunal Supremo | Sistema de Rotación Automática por Juez Presidente |
| 5. Reglas del Tribunal([5]) de Apelaciones | Reglas para la Creación y Funcionamiento de la Unidad Especial de Jueces de Apelaciones |
| 6. Sede: Sección Norte, Centro Judicial, San Juan, 10mo. Piso<br><br>Sede Sección Sur, Centro Judicial, Ponce | Sede: Centro Judicial de San Juan, 10mo. Piso |
| 7. Juez Administrador General, Tribunal de Apelaciones | Juez Coordinador, Unidad Especial de Jueces de Apelaciones |
| 8. Secretaría Tribunal de Apelaciones | Subsecretaría de Unidad Especial de Jueces de Apelaciones |
| 9. Alguacil General y personal auxiliar | Alguacil General y personal auxiliar |

_ _ _ _ _

([5]) Las Reglas del Tribunal de Apelaciones prácticamente eran un calco del Reglamento de este Tribunal Supremo.

| | | |
|---|---|---|
| 10. | Apelaciones criminales, *certiorari* pendientes y en trámites, y otros asuntos | "[C]ualquier caso, asunto o procedimiento" ante el Tribunal Supremo; esto es, apelaciones y *certiorari pendientes* y en *trámites*; nuevos *casos criminales y civiles que se presenten* |
| 11. | Sentencia u opiniones en los *méritos* | "*[I]nforme* con un resumen de hechos y análisis del derecho aplicable", esto es, sobre los méritos |
| 12. | Notificación de *Sentencia* a litigantes | Notificación de *Informe* a litigantes |
| 13. | Litigantes acuden al Supremo *vía Certiorari* | Litigantes "presenta[n] objeciones" (acuden) al Supremo *vía Moción* |
| 14. | Supremo podrá *revocar*, confirmar o modificar | Supremo podrá adoptar (confirmar), modificar o no dar curso |

Nuestra facultad interpretativa no es irrestricta ni nos permite recurrir a esquemas como éstos en donde decimos una cosa y hacemos otra, donde al palio de un subterfugio usurpamos poderes constitucionales que no tenemos, *y ponemos peligrosamente en jaque el balance constitucional.*

## V

En lo específico, un examen preliminar de las Reglas revela que con las mismas el proceso deliberativo y decisorio interno institucional de este Tribunal Supremo se verá *seriamente afectado* mediante la notificación a las partes litigantes del *Informe*. Regla 9. Como expresáramos, todo *Informe* de los Paneles de la Unidad Especial de Jueces de

Apelaciones (Comisionados Especiales) será en los *méritos*, esto es, con un *"resumen* de los hechos y análisis del *Derecho aplicable"*, lo que presupone una ponencia debidamente fundamentada y, por imperativo, una evaluación del récord, de los autos originales, alegatos y señalamientos de las partes. Una vez notificada, las partes podrán presentar ante este Tribunal Supremo sus objeciones. Ese *Informe* tiene que tener algún propósito y valor adjudicativo *inicial y final*. O de lo contrario, ¿por qué se exige a estos paneles el resumen de hechos y análisis del Derecho aplicable? ¿Para qué se redacta y envía a las partes? ¿Por qué éstas podrán exponer sus objeciones debidamente fundamentadas?

Indudablemente, de esta forma se interpone entre los Jueces del Tribunal Superior, los litigantes y este Tribunal Supremo un panel de tres (3) Jueces de Apelaciones (Comisionados Especiales), con facultad de evaluar *inicialmente* los méritos de sus señalamientos y reclamos, formular sus propias determinaciones de hecho (resumen) y conclusiones (análisis) de derecho.

Precisamente, antes de que fuera suprimido el Tribunal de Apelaciones, ¿no era esa la función de los paneles de sus jueces, esto es, evaluar los casos y asuntos en grado apelativo en virtud de "un resumen de los hechos y un análisis del derecho aplicable"? Y una vez suprimido, ¿no es esa la función por excelencia, atributo *exclusivo* de la *competencia apelativa* de nosotros los jueces miembros de este Tribunal Supremo?

*A la postre, es obvio que ese Informe en los méritos no es otra cosa que una propuesta Sentencia, u ocasionalmente, una Orden de Mostrar Causa. En su equivalencia funcional, ambas*, por imperativo intiman un curso decisorio del *iuditium, área que constitucionalmente es prerrogativa íntima judicial y pertenece sólo a los integrantes de este Tribunal Supremo; no es susceptible de ser compartida en etapas con otros jueces, llámensele o no Comisionados*

*Especiales*. Después de todo, la sentencia es "reflejo y culmen del resultado del proceso, hunde sus raíces indefectiblemente en el espectro factual que de aquél se deriva. Pero la interpretación de los hechos, la reconstrucción escenográfica de su originación, con su sucesión cronológica y sus implicaciones subjetivas, *es la delicada función recreativa y de síntesis que viene reservada a los Jueces al término de desarrollo del proceso ...*". (Énfasis suplido.) F. Soto Nieto, *Correlación entre acusación y sentencia*, Madrid, Ed. Montecorvo, 1979, pág. 10.

Repetimos, aunque la Regla 9(B) dice que "cualquiera de las partes podrá presentar al Tribunal Supremo sus objeciones", al imponerles el deber de formularlas "debidamente fundamentadas", para fines decisorios está diciendo que el *Informe* goza de una *presunción controvertible de corrección*, característica *única* de las sentencias judiciales. Estos *Informes*, ¿tendrán que ser por unanimidad o admitirán disensos por alguno de los tres (3) Jueces del Panel de Apelaciones (Comisionados Especiales)?

Más aún, ante nosotros mismos, Jueces de este Tribunal Supremo, *el trámite inyecta unos ingredientes decisorios sumamente peligrosos que tienden a desintegrar los elementos fundamentales de toda sentencia.* Nuestra deliberación y revisión, ¿será sobre el dictamen del Tribunal de Primera Instancia o los méritos del Informe del Panel? ¿Cuál gozará mayor presunción de corrección? La deferencia en materia de aquilatar credibilidad de testigos, ¿será sobre las determinaciones de hecho de los Jueces del Tribunal Superior o el "resumen de hechos" del Panel de Jueces de Apelaciones (Comisionados Especiales)? Ante los miembros de este Tribunal Supremo que minoritariamente discrepen del *Informe*, ¿qué pasará? ¿Tendrá más valor adjudicativo el criterio de tres (3) Comisionados Especiales? ¿Quedará el *Informe* totalmente sin efecto?

En los expedientes de las apelaciones criminales y revisiones civiles sujetos a este nuevo esquema, ¿cuál será el

material básico decisorio que debemos revisar? ¿Dejaremos de leer los alegatos? ¿Quedarán sin leer las Transcripciones o Exposiciones Narrativas de la Prueba? ¿Omitiremos examinar minuciosamente la prueba documental?

> El expediente judicial vive pleno de humanidad. Inquietudes, ansiedades, esperanzas laten sin cesar en cada una de sus hojas. *Es el trámite cierto hacia una decisión. Una persona, una familia, un grupo pueden estar pendientes del desarrollo, que conduce a un resultado.* Momentos tensionales dominan los ánimos de quienes esperan. Naturalmente, mucho dependerá de la importancia del problema juzgado. *Pero, por mínimo que fuere, nunca se ausentarán las humanas inquietudes.* N. Amílcar Cipriano, *La humanidad del expediente judicial*, Buenos Aires, Ed. Depalma, 1976, pág. 19.

Ciertamente, la aplicación de estas Reglas peculiares y novedosas cierra un capítulo en la historia de este Tribunal. *Nunca será lo mismo*; jamás estas Reglas lograrán alcanzar cualitativamente la excelente dinámica colegiada y estimativa, fáctica y jurídica del actual proceso deliberativo *directo* de sus siete (7) jueces. La psicogenética de juzgar es algo más complejo.

> "Juzgar", decía Platón, "es representarse un mundo inteligible en el cual todas las ideas que entran en el juicio se desarrollan en una inmutable e inseparable unidad." En este pensamiento se resume el doble proceso intelectual que concluye con la formulación del juicio. *En efecto, no basta la simple percepción de los acontecimientos; es necesario que el juez los analice inteligentemente para luego coordinarlos en esa labor de síntesis que es la sentencia.* Toda la vida intelectual está en estos dos procesos; el uno de descomposición y de análisis, el otro de asimilación y de síntesis. Todas las impresiones que llegan a la conciencia a través de los sentidos, todas las ideas que surgen en nosotros, sugeridas por la conversación *o por la lectura*, todos los sentimientos, todas las impresiones que pueden ponernos en conocimiento de las relaciones que tenemos con el mundo exterior, y de nuestros vínculos con los otros hombres, todos los fenómenos síquicos, en una palabra, pasan más o menos por estos dos procesos de elaboración. El análisis se realiza en virtud del juego espontáneo o directo de la reflexión, de las ideas, de las tendencias ya organizadas, de las costumbres ya adquiridas que separan y aíslan, en los hechos nuevos que se conocen, los elementos que pueden

adaptarse a ellas y complementarlas. (Énfasis suplido.) E. Altavilla, *Sicología Judicial*, Buenos Aires, Ed. Depalma, 1970, Vol. 2, pág. 1090.

## VI

Es evidente que el concepto "resumen de hechos" sólo puede significar que la determinación de credibilidad adoptada por los Jueces del Tribunal Superior será ahora *revisada e inexorablemente adjudicada* por el Panel de Jueces Apelativos (Comisionados Especiales), porque de otro modo no tendría razón de ser ese mecanismo. ¿Qué harán entonces las partes? ¿En qué limbo queda esa facultad estimativa de los jueces superiores? Las partes y los Jueces del Tribunal Superior, como protagonistas del juicio y drama vivo en primera instancia, ¿no son acreedores a que las apelaciones y revisiones sean íntegramente examinadas y resueltas por este Tribunal Supremo, sin la intervención de otros jueces (Comisionados Especiales)?

Valga aclarar, y no se necesita mucho esfuerzo mental para comprender, que *este trámite nuevo no es comparable* con los informes, memorandos internos y recomendaciones de nuestros oficiales jurídicos, los cuales son *confidenciales y simplemente constituyen un valioso instrumento auxiliar decisorio*. Ellos, ni son jueces ni actúan como Comisionados Especiales. Como se ha dicho, "[s]on parte íntima del proceso judicial del Tribunal. Como tales, los oficiales jurídicos deben permanecer mayormente encubiertos en una 'anonimia espléndida' ". (Traducción nuestra.) R.L. Stern, E. Gressman y S.M. Shapiro, *Supreme Court Practice*, 6ta ed., pág. 21.

Además, existe *una gran diferencia* en la función y el mecanismo de los Oficiales Jurídicos del Panel Central. Tampoco son jueces ni actúan como Comisionados Especiales. Sólo rinden unos informes en la *etapa en que todavía este Tribunal y sus miembros no han ejercitado su*

*prerrogativa judicial discrecional de si expiden o no.* Esa fase *preliminar dista mucho* de la referente a la *adjudicación en sus méritos, etapa exclusiva, de carácter indelegable que pertenece sólo a los siete (7) miembros de este Tribunal.*

Finalmente, distinto a los Oficiales Jurídicos, las Reglas presentan una dinámica adjudicativa peculiar que *involucra activa y directamente* a los Jueces del Tribunal de Apelaciones —vía *Comisionados Especiales*— como juzgadores en el debate forense sobre los méritos de las causas *durante* el proceso decisorio del Tribunal Supremo. *A nivel del más alto Foro del país es una mala técnica adjudicativa que, repetimos, subvierte la tradicional y necesaria discreción y confidencialidad con que se debaten los casos, asuntos y procedimientos antes de certificarse y notificarse formalmente a las partes nuestras decisiones.*

## VII

La erosión constitucional es tan grave y la amplitud de las Reglas es tal que el extinto Tribunal de Apelaciones reaparece ahora con el disfraz de *Unidad Especial de Jueces de Apelaciones,* con autoridad y competencia *mucho mayor* a la que antes tenía. Al respecto, la Regla 7A expone que el Tribunal Supremo "podrá encomendar[le] *cualquier* caso, asunto o procedimiento ante su consideración ...". Comienza entonces a aparecer el *esquema permanente,* concediéndoles facultades y tareas judiciales —ya las tienen— (Regla 5(A)), a los jueces del desaparecido Tribunal de Apelaciones para intervenir, incluso en cualquier caso, asunto o procedimiento *judicial apelado o traído ante nuestra consideración después de ser suprimido.* De los ciento veinte (120) casos pendientes ante el Tribunal de Apelaciones al terminar los noventa (90) días, y que pasaron a nuestra consideración, al presente, en este Tribunal Supremo hay catorce (14) sometidos; otro fue resuelto; los restantes ciento cinco (105) están en trámite de perfeccionarse.

En este extremo no somos ilusos: si hoy una mayoría del Tribunal puede constitucionalmente adoptar semejante esquema *permanente con paneles de tres (3) jueces*, ¿qué necesidad habría entonces de *legislar* un tribunal intermedio?

En otras de las dimensiones negativas de estas Reglas, ¿no están, de este modo, violando el *espíritu* de la Sec. 3 del Art. V de la Constitución, *supra*, pág. 356, preceptivo de que el número de integrantes de este Tribunal "*sólo* podrá ser *variado por ley*, a solicitud del propio Tribunal Supremo"? (Énfasis suplido.) *Como resultado de la arteria conectora de colegiación de estas Reglas*, ¿cuántos jueces hay ahora en el Tribunal Supremo? ¿Siete (7) o veintiuno (21)? Y recuérdese que la Constitución autoriza el funcionamiento de *Salas* en este Tribunal Supremo únicamente si son integradas por sus Jueces.

Precisamente, todo este esquema reglamentario sobre jueces de apelaciones como Comisionados Especiales pasa por alto que el juez que interviene en un caso o proceso actúa sólo si puede desarrollar plena y totalmente la función judicial con relación a ese caso o proceso, porque es *juez competente*. Oderigo, *op. cit.*, pág. 212. Los jueces de apelaciones *no tienen competencia alguna* sobre las apelaciones, las revisiones y los *certiorari* que corresponden *exclusivamente* a los Jueces de este Tribunal Supremo. *Por regla no podemos dársela; ya hemos visto que, al decir del delegado Gutiérrez Franqui, "claramente y en palabras que no dejan lugar a dudas", carecemos de esa facultad constitucional.*

.Nos oponemos a lo que potencialmente, en la práctica, no será otra cosa que un tratamiento y traslado selectivo de ciertos casos a los paneles de jueces apelativos (Comisionados Especiales). "No debe olvidarse que toda persona que se halla sujeta a una decisión judicial aspira a que su caso sea tratado individualmente porque, en general, posee el íntimo convencimiento de que su situación es

irrepetible." A.E. Pérezluño, *Cibernética, Informática y Derecho*, 1976, pág. 35.

Repetimos, los siete (7) jueces de este Tribunal Supremo estamos impedidos de compartir constitucionalmente juicios valorativos y la psicodinámica decisoria sobre los méritos de las apelaciones, las revisiones y los *certiorari* de *nuestra competencia* y consideración con otros jueces que no pertenecen a este Tribunal. Sobre estos extremos no pretendemos agotar el análisis. Posponemos para una ocasión futura elaborar más profundamente y contestar varias otras interrogantes, entre ellas, si estas Reglas infringen el debido proceso de ley y la igual protección de las leyes, y el derecho de los litigantes, acusados y del Pueblo de Puerto Rico a que sus recursos, *en todas sus etapas*, sean adjudicados por este Tribunal Supremo conforme dispone el ordenamiento constitucional vigente; también, si menoscaban las prerrogativas judiciales, de rango constitucional, no sólo de los miembros de este Tribunal Supremo y de los jueces de Apelaciones, sino de los Jueces del Tribunal Superior.

## VIII

En nuestro actual diseño constitucional, el Tribunal Supremo no puede reclamar poderes *absolutos* que la Constitución no le da; *menos la capacidad de procrear artificialmente tribunales*. Al igual que en los tiempos de Rousseau y Montesquieu, la división de funciones públicas entre los Poderes Ejecutivo, Legislativo y Judicial, *sigue siendo el mejor antídoto contra la tiranía de uno solo*.

*La más preciada fuente de autoridad está en la fuerza persuasiva inherente de nuestros fundamentos y nuestras decisiones*. En la medida en que *vía interpretación o reglamento* recurramos al artificio, al sofisma, al fingimiento, destrozamos el fundamento del alto sitial de este Foro, trabajo de muchas generaciones que nos precedieron y del

cual todos somos *celosos custodios*. Somos testigos de un esquema reglamentario *simbiótico —Jueces Supremo-Apelativo—* que excede lo racionalmente tolerable. ¡Y lo peor de todo, convirtiendo a la mayoría de este Tribunal en *juez y parte* de la *in*constitucionalidad de sus *propios actos*!