Una lectura de los votos disidentes emitidos hoy nos remontan a un famoso diálogo de Platón en el cual Sócra-tes cuestiona al reconocido sofista Gorgias en cuanto al significado de Retórica. En el intercambio, Sócrates argu-menta que “[l]a Retórica, al parecer, es la autora de la per-suasión, que hace creer, v no de la que hace saber. respecto de lo justo y de lo injusto .... [N]o se propone instruir a los tribunales y a las demás asambleas acerca de lo justo y de lo injusto, sino únicamente atraerlos a la creencia”. (Enfa-sis suplido.) Platón, Diálogos: Gorgias, México, Ed. Porrúa, 2007, pág. 206.
Así, acuñando palabras punzantes y haciendo uso de la hipérbole retórica a la cual nos tiene acostumbrados, la disidencia intenta inculcar una creencia en el Pueblo en cuanto al reciente proceder de una mayoría de los miem-bros de este Tribunal. Así, no debe sorprendernos que la disidencia haga un llamado a utilizar el “ideario colecti-vo”(1) de nuestra sociedad, “el comportamiento durante se-senta años de los actores constitucionales que han vivido su historia”(2) e, inclusive, otra “verdadera Constitución, voluntad viva del Pueblo”(3) para analizar el significado de una disposición constitucional. En el fondo, se nos hace un *576 llamado a abandonar el texto claro de nuestro documento constitucional, así como la intención de quienes lo redactaron.
De esta manera, por primera vez en nuestra historia constitucional se anuncia en los votos disidentes que la Constitución de Puerto Rico creó dos entes en el seno de este Tribunal Supremo: un Pleno, que opera de forma cole-giada, y un Juez Presidente, independiente, autónomo, con aparentes poderes plenarios y con la capacidad de someter con su discreción a toda la Rama Judicial. Se trata así de la celebración de una dictadura imperial sin aparentes lími-tes en su facultad administrativa.
Pero detrás de toda la tinta derramada en la disidencia, escondido entre las líneas y asfixiado por sofismas, sub-yace un concepto que permea todo asunto en nuestro orde-namiento constitucional: el Poder. Hoy, como en muchas otras ocasiones, debemos analizar de manera sosegada: “¿quién tiene el poder para qué?” R. Serrano Geyls, Derecho constitucional de Estados Unidos y Puerto Rico, San Juan, Ramallo Bros. Printing, 1986, Vol. I, pág. 571. Así, resulta de cardinal importancia indagar a quién le otorgó la Constitución el poder para administrar los tribunales en Puerto Rico.
Frecuentemente, en las situaciones en las cuales un ente argumenta que ostenta un poder constitucional para ejecutar determinada acción a expensas de otro, la acción controversial se intenta disfrazar inocentemente con piel de oveja. Sin embargo, los hechos que dieron génesis a las Resoluciones de epígrafe no fueron inocentes; en esta si-tuación histórica, el lobo no vino disfrazado de oveja.(4)
En resumen, procederemos a realizar un análisis sose-gado y profundo de la See. 7 del Art. V de la Constitución de Puerto Rico, L.P.R.A., Tomo 1. Utilizaremos como herra-mientas interpretativas el texto mismo de la disposición constitucional y el historial de la Convención Constitu- *577 yente. Así, y a manera de resumen, abundaremos en los aspectos siguientes:
• La contratación de un investigador por parte de la Oficina de Administración de los Tribunales (O.A.T.) a es-paldas de los miembros del Tribunal Supremo, lo que obligó a una mayoría de este Tribunal a promulgar las Re-soluciones de epígrafe para evitar el carpeteo y la persecu-ción, a la vez que protegimos la independencia de la Rama Judicial.
• Un análisis textual del Art. V, Sec. 7, de nuestra Constitución, el cual revela que el documento constitucio-nal delegó al Tribunal Supremo la facultad para reglamen-tar la administración de los Tribunales.
• Un estudio riguroso del historial de la Convención Constituyente, incluyendo el Informe de la Comisión de la Rama Judicial, el cual entendió que el Tribunal Supremo tendría el poder de “superentender en los tribunales”.
• Un estudio de las ocasiones en las cuales el Pleno del Tribunal Supremo ha utilizado la facultad de reglamentar la administración de la Rama Judicial en ocasiones ante-riores sin que nadie la cuestionara, contando, incluso, con la conformidad de los Jueces que hoy disienten. Véanse, por ejemplo: In re Enmda. Regl. Adm. Pers. R.J., 167 D.P.R. 822 (2006); In re Enmda. Regl. Adm. Pers. R.J. I, 162 D.P.R. 425 (2004); In re Enmda. Art. 19.1 Regl. A.S.P.R.J., 158 D.P.R. 191 (2002); In re Reglas Adm. T.P.I., 148 D.P.R. 883 (1999).
• Un estudio sobre el proceder de este Tribunal en Regl. Creac. y Func. Unidad Esp. J. Apel., 134 D.P.R. 670 (1993), en el cual el entonces Juez Presidente Señor An-dreu García, quien era consciente del límite de su facultad como Juez Presidente, le solicitó al Pleno del Tribunal Supremo que aprobara unas reglas de administración para la creación y el mantenimiento de la unidad especial de jue-ces de apelaciones. Valga señalar que en aquel entonces el hoy Juez Presidente Señor Hernández Denton votó con- *578 forme con la decisión del Tribunal. Al parecer, tenía una visión distinta a la que tiene ahora de las facultades del Pleno del Tribunal Supremo.
• Y, tal como lo indica la Jueza Asociada Señora Fiol Matta en su voto, ni el Juez Presidente en su carácter individual ni la Q.A.T. tienen facultad para ordenar investi-gaciones contra los demás miembros de este Foro. Así las cosas, la O.A.T. no tenía autoridad jurídica para contratar personal alguno para investigar.
Por ende, toda vez que conocemos el poder que la Cons-titución de Puerto Rico delegó al Pleno de este Tribunal Supremo, estamos conformes con las Resoluciones de epígrafe. Sin embargo, ante los ataques esbozados en la disidencia y las advertencias huecas, irresponsables y fal-sas sobre un derrumbamiento constitucional, nos vemos en la obligación de emitir estas expresiones para vindicar el poder constitucional de esta Curia.
I
Los hechos que dieron génesis a la coyuntura en la cual se encuentra hoy este Tribunal son de conocimiento público. Curiosamente, tanto el Pueblo de Puerto Rico como los Jueces Asociados de este Tribunal, nos enteramos a través del mismo medio noticioso.
Durante el mes de diciembre de 2011, surgieron una serie de denuncias en cuanto a la mal utilización de fondos públicos y otros recursos de la Rama Judicial por parte del Juez Presidente, Hon. Federico Hernández Denton. Ante estas denuncias, tanto la Rama Ejecutiva como la Legisla-tiva comenzaron investigaciones sobre el asunto.(5)
Posteriormente, y para sorpresa de todos los demás miembros que componemos esta Curia, el 26 de enero de 2012 un diario de circulación general, en exclusiva, publicó *579 una noticia en la cual la Directora Administrativa de la O.A.T. anunció la contratación del Ledo. César López Cintrón. Según reportó el diario, la contratación del licen-ciado López Cintrón respondía a las serias denuncias que se habían hecho contra el Juez Presidente, por lo cual la investigación encomendada incluiría a todos los jueces de la Rama Judicial y se enfocaría en el uso de recursos y fondos públicos, y en alegadas intervenciones indebidas con procedimientos ante los tribunales de instancia. Tras-cendió, a su vez, que la investigación incluiría a todos los Jueces y Juezas de este Tribunal. El Juez Presidente con-firmó que tenía conocimiento sobre la contratación del li-cenciado López Cintrón. Cabe señalar que dicho Contrato se suscribió el 13 de enero de 2012 y no fue hasta el 26 de enero que se anunció públicamente su existencia.
Por su parte, seis Jueces de esta Curia emitimos una comunicación pública en la cual denunciamos el proceder del Juez Presidente y de la O.A.T., y mostramos preocupa-ción ante la posibilidad que la investigación pudiese inter-ferir con las investigaciones que se llevan a cabo por parte de las otras ramas constitucionales del Estado.
A su vez, el proceder de la O.A.T. levantó serias interro-gantes constitucionales. Ello ante el incuestionable hecho que la Constitución de Puerto Rico, en su Art. V, Sec. 11, le reserva exclusivamente a la Asamblea Legislativa la potes-tad para comenzar procesos de investigación que pudieran culminar en la residencia de miembros de este Foro.
Ante toda esta situación, se convocó a una reunión ex-traordinaria del Pleno de este Tribunal para el miércoles 1 de febrero de 2012, a tenor de la Regla 6(b) del Reglamento del Tribunal Supremo de Puerto Rico —In re Reglamento Tribunal Supremo, 183 D.P.R. 386, 403 (2011)— a la cual asistieron siete de los nueve miembros de esta Curia. (6) En *580 esta reunión se discutieron las dos Resoluciones de epígrafe. Mediante la primera, en virtud del poder expreso contenido en la See. 7 del Art. V de la Constitución de Puerto Rico, supra, aprobamos las Reglas para los Proce-dimientos de Investigaciones Especiales Independientes de la Rama Judicial (In re Aprobación Rs. Proc. Esp. RJ, 184 D.P.R. 500 (2012)). A tenor con estas reglas, promulgamos una segunda Resolución, en la cual designamos una Comi-sión compuesta por ciudadanos para que investiguen todo el procedimiento mediante el cual se otorgó el contrato al licenciado López Cintrón, así como el uso de fondos y re-cursos públicos por parte de la O.A.T. y su Directora Administrativa.
En Noriega v. Gobernador, 122 D.P.R. 650, 654 (1988), esbozamos que “[n]o hay nada más preciado para un ‘hombre de bien’ que su dignidad y reputación en la comunidad”. Eso se expresó en el contexto de las llamadas “carpetas” que por décadas la Policía de Puerto Rico reco-piló sobre ciudadanos por el mero hecho de sus ideologías.
Creemos que esas palabras tienen gran peso en el Puerto Rico de hoy. Iniciar una investigación ilegal contra los Jueces del Tribunal Supremo por el hecho de que exis-tan alegaciones públicas contra el Juez Presidente es un acto claro de intimidación institucional de parte de la O.A.T. que claramente lacera esta institución. Con la apro-bación de las Resoluciones en controversia, este Foro pro-tegió firmemente su integridad como organismo rector de la Rama Judicial, por mandato constitucional. A la vez, creamos una Comisión verdaderamente independiente, para que investigue, no a los Jueces de este Tribunal, sino cualquier alegación de uso indebido de fondos y de recursos de la Rama Judicial. Con eso evitamos el carpeteo y la persecución, y protegemos la independencia de esta Rama sin tratar de interferir con las investigaciones que ejercen *581 las otras Ramas en el ejercicio de sus facultades constitucionales. Los fondos y los recursos de esta Rama son para el servicio del Pueblo y no para el carpeteo o la defensa personal de alguno de los integrantes de este Tribunal.
Gran parte de los votos disidentes que hoy se emiten se centran en argumentar que el proceder de una mayoría de miembros de este Tribunal fue ultra vires. Como mencio-namos anteriormente, amparándose en ejercicios de retó-rica, aluviones de sofismas y lecturas acomodaticias de la Convención Constituyente, la disidencia intenta nublar la tinta de la primera oración de la See. 7 del Art. V de la Constitución de Puerto Rico, en un ejercicio inútil de negar su significado.
En aras de desenmascarar este intento de hacer creer que este Tribunal actuó más allá de sus contornos consti-tucionales, nos parece obligatorio realizar un análisis de la referida disposición constitucional.
II
A. La disposición constitucional al amparo de la cual se aprobaron las Resoluciones de 1 de febrero de 2012 dis-pone:
El Tribunal Supremo adoptará reglas para la administra-ción de los tribunales las que estarán sujetas a las leyes rela-tivas a suministros, personal, asignación y fiscalización de fondos, y a otras leyes aplicables en general al gobierno. El Juez Presidente dirigirá la administración de los tribunales y nombrará un director administrativo, quien desempeñará su cargo a discreción de dicho magistrado. (Enfasis suplido.) Art. V, Sec. 7, Const. E.L.A., supra, ed. 2008, pág. 416.
Una lectura inicial de esta disposición revela clara-mente la delegación de poder a dos entes. La primera ora-ción delega el poder al Tribunal Supremo para adoptar las reglas para la administración de los tribunales. Por su *582 parte, la segunda oración delega dos poderes a la figura del Juez Presidente: dirigir la administración de los tribuna-les, y nombrar a un director administrativo, el cual conti-nuará en el cargo a su discreción.
Resulta evidente que la See. 7 del Art. V de la Constitu-ción de Puerto Rico facultó al Tribunal Supremo —como ente colegiado— a formular las reglas que entendiese ne-cesarias para administrar eficientemente los tribunales de Puerto Rico. Es decir, constitucionalmente es el Pleno del Tribunal Supremo el que formula, de entenderlo necesario, el cuerpo de reglas administrativas de toda la Rama Judicial.
Por su paite, se delegó al Juez Presidente el poder de ejecutar las reglas adoptadas por el Pleno del Tribunal Supremo en cuanto a la administración de los tribunales. Para esa encomienda, el Juez Presidente cuenta con la he-rramienta de nombrar a un Director Administrativo que servirá a su discreción.
Para convalidar esta interpretación, conviene estudiar el proceso mediante el cual se aprobó esta disposición constitucional. Ello en aras de disipar las nubes retóricas que desesperadamente conjura la disidencia sobre esta cláusula constitucional.
Toda vez que nuestro documento constitucional es de reciente adopción, la labor de investigar su historial para interpretar sus diversas disposiciones “es relativamente fácil, ya que conservamos las memorias y los debates de la Asamblea Constituyente”. L. Muñiz Argüelles y M. Fraticelli Torres, La Investigación jurídica en el Derecho puertorriqueño, Bogotá, Ed. Temis, 2006, pág. 322. Así, la obra que por excelencia se utiliza para esta encomienda es el Diario de Sesiones de la Convención Constituyente. “Esta obra ... recoge los debates de los integrantes de la conven-ción durante el proceso de discusión y aprobación del texto final sometido al Pueblo de Puerto Rico y al Congreso de los Estados Unidos”. íd.
*583 La utilidad de este método de interpretación ha sido re-conocida por diversos miembros de este Tribunal, inclusive por los tres jueces que hoy suscriben votos disidentes. Véanse, por ejemplo: Córdova y otros v. Cámara Representantes, 171 D.P.R. 789, 805-807 (2007) (Hernández Denton, J.P.); García v. Aljoma, 162 D.P.R. 572, 588-591 (2004) (Hernández Denton, J.); De Paz Lisk v. Aponte Roque, 124 D.P.R. 472, 484-485 (1989) (Hernández Denton, J.); In re Solicitud Aumentar Núm. Jueces TS, 180 D.P.R. 54, 105 esc. 2 y 107 esc. 5 (2010) (Voto disidente de Fiol Matta, J.); Herrero y otros v. E.L.A., 179 D.P.R. 277, 292-294 (2010) (Rodríguez Rodríguez, J.); Santana v. Gobernadora, 165 D.P.R. 28, 46-51 (2005) (Rodríguez Rodríguez, J.).
B. La Comisión de la Rama Judicial de la Convención Constituyente estuvo dirigida por el distinguido delegado Ernesto Ramos Antonini. En su Informe a la Convención, la Comisión hizo un análisis detallado del significado de la See. 7 del Art. V, específicamente en cuanto al término “ad-ministrar” ahí contenido. Informó la Comisión lo siguiente:
Se recomienda que se traspase al Tribunal Supremo la facul-tad de administrar los tribunales de justicia de Puerto Rico, facultad que se viene ejerciendo por el Procurador General. La Comisión entiende que las disposiciones de esta sección con-tienen garantías básicas de la independencia del poder judicial. ... La Comisión hace constar que el término “administra-ción”, usado en esta sección, comprende, sin que se entiendan excluidas otras similares o análogas, las siguientes funciones:
(1) Compilar estadísticas y preparar informes.
(2) Alquilar locales, comprar y proveer equipo y servicios.
(3) Conceder licencias y vacaciones a funcionarios y empleados.
(4) Investigar quejas y formular cargos, ante la autoridad correspondiente, contra funcionarios y empleados.
(5) Autorizar desembolsos dispuestos por ley y revisar las cuentas de todos los tribunales.
(6) Asignar y trasladar jueces.
(7) Aprobar reglamentos para las distintas cortes.
(8) Superentender en los tribunales. (Enfasis y subrayado *584 nuestros y escolios omitidos.) 4 Diario de Sesiones de la Con-vención Constituyente 2613 (ed. conmemorativa 2003).(7)
De particular importancia en el Informe es el inciso (8) sobre las funciones que la Comisión de la Rama Judicial entendía se encomendarían al Tribunal Supremo. Según la Real Academia Española, la palabra “superentender” signi-fica “inspeccionar, visitar, gobernar”.(8) No cabe duda de la magnitud del poder que la Convención Constituyente de-legó al Tribunal Supremo en cuanto a la administración de los tribunales en Puerto Rico. Curiosamente, en el voto disidente del Juez Presidente Señor Hernández Denton, al citar este Informe, se omite el párrafo introductorio, en el cual queda clara la delegación del poder de administración de los tribunales al Tribunal Supremo. Véase Voto disi-dente del Juez Presidente Señor Hernández Denton, pág. 19.
Por otro lado, se puede apreciar del Informe que, previo a la adopción de la Constitución en 1952, la Administra-ción de los Tribunales estaba encomendada al Procurador General, figura supeditada a la Rama Ejecutiva. Ello pro-vocó críticas durante la Convención Constituyente y exis-tía “virtual unanimidad de criterio” en que el sistema debía ser reformado. Véase J. Trías Monge, Historia Constitucio-nal de Puerto Rico, Río Piedras, Ed. Universidad de Puerto Rico, T. III, pág. 98. (9)
Así, tomando como modelo las Constituciones de los es- *585 tados de California, Connecticut, Kentucky, Maryland, Missouri, West Virginia y, particularmente, la de New Jersey, así como las recomendaciones de la American Bar Association y varios escritos de Roscoe Pound y Arthur Vanderbilt, la Comisión de la Rama Judicial recomendó el texto de la See. 7 del Art. V, en la cual claramente se le transfiere el poder de administración de los tribunales al Tribunal Supremo. La dirección de esa administración, es decir, la ejecución de las políticas administrativas, se de-legó en la figura del Juez Presidente.
Es durante un debate sobre la propuesta sección consti-tucional en el cual podemos apreciar de manera clara la intención de la Convención Constituyente de delegar el po-der de adoptar las reglas de administración de los tribuna-les al Pleno del Tribunal Supremo. Durante una sesión de debate, el delegado Valentín Vizcarrondo propuso una en-mienda al texto de la See. 7 para que, en vez de servir a discreción del Juez Presidente, el Director Administrativo de los Tribunales estuviese sujeto a un reglamento promul-gado por el Juez Presidente. Conviene citar in extenso del debate en cuanto a la enmienda para sustraer la intención de los constituyentes:
Sr. VALENT[Í]N VIZCARRONDO: Para una enmienda. En la página 2, línea 23, tachar “a discreción” y en su lugar poner; “de acuerdo con el reglamento preparado por dicho magistrado”. Leería así: “El Juez Presidente dirigirá la admi-nistración de los tribunales y nombrará un director adminis-trativo quien desempeñará su cargo de acuerdo con el regla-mento preparado por dicho magistrado”. Sencillamente yo creo que la persona que el Juez Presidente nombre tiene que ser una persona idónea, deber ser un abogado, y me parece que [el] un abogado actuar de acuerdo a la discreción de otra persona no le da personalidad, ni siquiera le permite usar su criterio. Y, por esa razón yo creo que no debe ser la palabra “discreción” sino sencillamente cambiar esa palabra por “re-glamentación” en alguna forma que esta persona que va a des-empeñar ese cargo se sienta con dignidad en el cargo. No es un lacayo, es un abogado que va a interpretar leyes, que va a administrar tribunales de Puerto Rico. Me parece a mí que *586 debe dársele dignidad a ese cargo y restarle eso de que va a estar siempre supeditado a lo que quiera el abogado presi-dente del Tribunal Supremo.
Sr. FERN[Á]NDEZ M[É]NDEZ: Una pregunta al Delegado.
Sr. VALENT[Í]N VIZCARRONDO: Sí.
Srta. PRESIDENTA: El delegado señor Fernández Méndez.
Sr. FERN[Á]NDEZ MÉNDEZ: Una pregunta para aclarar. ¿Lo que ha querido decir es reglamento preparado por dicho ma-gistrado, por el tribunal o por el magistrado?
Sr. VALENT[Í]N VIZCARRONDO: El Juez Presidente.
Sr. FERN[Á]NDEZ MÉNDEZ: ¿Por el magistrado o por el tribunal?
Sr. VALENTIN VIZCARRONDO: No. Aquí el que nombra y el que va a dirigir es el Juez Presidente.
Sr. FERNÁNDEZ MÉNDEZ: ¿Que él haga su propio regla-mento?
Sr. VALENT[Í]N VIZCARRONDO: Sí. Es distinto.
Srta. PRESIDENTA: El delegado Ramos.
Sr. RAMOS ANTONINI: Señorita Presidenta: Digo, lo que yo veo es que nuevamente se tiende a darle énfasis a la persona-lidad del administrador en posible detrimento de la persona-lidad del Juez Presidente, a quien se le dice “usted será el responsable de la administración de justicia en Puerto Rico”, en cuanto se aprobara una disposición como ésa, si tuviera el alcance que señala el compañero.

Me permito llamar la atención además sobre dos puntos: Primero, aue la oración primera de ese propio artículo dice que es el Tribunal Supremo guien adoptará reslas para la admi-nistración de los tribunales. El tribunal, no el masistrado. Juez Presidente.

Sr. VALENT[Í\N VIZCARRONDO: Compañero Ramos Anto-nini, yo no decía el tribunal, sino el Juez Presidente.
Sr. RAMOS ANTONINI: Por eso, lo cual llevalría] a señalar una contradicción en el sentido de que por una falla ese propio artículo le da la facultad de reglas al tribunal en pleno y en-tonces en cuanto al administrador se la va a dar al Juez Presidente. (Corchetes en el original y suplidos, énfasis y su-brayado nuestros.) Diario de Sesiones de la Convención Cons-tituyente, supra, T. 3, págs. 1668 — 1670.
En este intercambio queda clara la interpretación que el delegado Ramos Antonini le da a la See. 7. Si se hubiera aprobado la enmienda del delegado Valentín Vizcarrondo, la sección hubiese contenido una contradicción insalvable, *587 al reconocer el poder de reglamentar en cuanto a la admi-nistración de los tribunales al Pleno del Tribunal Supremo, pero en cuanto al funcionario que sirve de herramienta en la administración, su reglamentación hubiese estado su-jeta a la voluntad del Juez Presidente. Afortunadamente, esa enmienda contradictoria fue derrotada, conservando la lógica de la doble delegación contenida en la See. 7.
Sorprendentemente, al hacer referencia a este debate en su Voto disidente, el Juez Presidente Señor Hernández Denton señala que la enmienda derrotada solo proveía que el Director Administrativo de los tribunales estuviera su-jeto a un “reglamento”. No obstante, de manera acomoda-ticia, omite mencionar que la intención del delegado Valen-tín Vizcarrondo era que el Director Administrativo estuviese sujeto a un reslamento promulsado por el Juez Presidente. La intención del delegado Ramos Antonini era dejar claro que el poder de reglamentar le pertenecería ex-clusivamente al Pleno del Tribunal Supremo y que el Juez Presidente no tendría facultades absolutas sobre la admi-nistración de los tribunales. Es ahí donde queda rechazada la interpretación de los tres votos disidentes en cuanto a la dictadura imperial que aparentemente entienden ellos queda constituida con la segunda oración de la See. 7.
Esta interpretación de la See. 7 se sustenta, además, con un estudio de las ponencias que se presentaron ante la Comisión de la Rama Judicial de la Convención Constitu-yente. El entonces Juez Presidente Señor Todd, Jr. mani-festó lo siguiente:
SR. PRESIDENTE: Señor Presidente del Tribunal Supremo: ¿No quiere decir lo manifestado por usted que no pueda ser un miembro del Tribunal Supremo el encargado de la administra-ción?
SR. TODD, JR.: ... Hay unas sugestiones en cuanto a que la administración de las cortes se ponga o en manos del Juez Presidente, o en manos del Tribunal Supremo o en manos de un consejo judicial. El Tribunal Supremo ya se pronunció con respecto a este particular, en el sentido de que fuera eso a la rama judicial, integrada por el Tribunal Supremo. Y decimos *588 que no debe ser en el Tribunal Supremo conjuntamente con un consejo judicial, porque en la práctica creo que no funcionaría bien. Si se quiere dársele a un consejo judicial, que se le dé; pero hay un proyecto radicado que dice que el administrador de las cortes será el Juez Presidente y que éste nombrará un administrador ejecutivo, y entonces el consejo judicial hará las recomendaciones para la administración de las cortes, lo que a mi juicio pone al Juez Presidente en una situación muy difícil porque quien enese [sic] caso hace toda la reglamentación y dispone todo lo que se haya de hacer es ese consejo judicial. Y eso, desde luego, es lo que nosotros vemos como peligroso. Por eso creemos que si es el Tribunal Supremo, debe ser el Tribunal Supremo el que haga toda la labor. Ponencia del Juez Pre-sidente Roberto H. Todd, Jr. ante la Comisión de la Rama Judicial de la Convención Constituyente, 1951.
La única forma de entender la See. 7 es reconociendo la intención de esa doble delegación de poder. Como muy bien expuso la Sección de Administración Judicial de la American Bar Association:
“Experience in both business and government organizations has established conclusively that effective administration requires the fixing of authority and responsibility. There should be no room for doubt in anyone’s mind —be he judge, lawyer, litigant, legislator or laymanwho has the responsibility for making a court system work well, both at the state and local level. This means that responsibility must be fixed both for establishing court administrative policies and for the execution of those policies....
While general policy may appropriately be formulated by a group, responsibility for executing policy must be vested in an individual. (Enfasis nuestro.) A.B.A. Section on Judicial Administration en J. Trías Monge, El Sistema Judicial de Puerto Rico, Río Piedras, Ed. U.P.R., 1978, pág. 222.
Así, es evidente que la See. 7 enmarcó claramente las facultades que ostentaría el Tribunal Supremo para llevar a cabo su labor constitucional de administrar los tribuna-les: el Tribunal Supremo en Pleno formularía las guías a través de reglamentación, y el Juez Presidente las ejecutaría.
En el voto disidente de la Jueza Asociada Señora Fiol Matta se dice que esta interpretación del texto de la See. 7, *589 particularmente en cuanto a la palabra “administración”, es “en extremo textualista”. Voto particular disidente de la Jueza Asociada Señora Fiol Matta, pág. 638. Dejando a un lado lo confuso que es tildar despectivamente al textua-lismo como una herramienta de interpretación constitucio-nal, el significado que el voto disidente provee de la See. 7 choca con el historial de la Convención Constituyente que ya hemos analizado. Resulta verdaderamente sorpren-dente la interpretación de que en una misma sección con tan solo dos oraciones, la intención de los constituyentes sea que la palabra “administración” tendría dos significa-dos, como aparenta hacer creer el voto disidente. No se nos provee respuesta en el disenso a cuál es la “administra-ción” que puede reglamentar el Tribunal Supremo y cuál es la “administración” que dirige el Juez Presidente, aun cuando el propio informe de la Comisión de la Rama Judicial a la Convención Constituyente no hizo distinción entre ambas palabras. La respuesta posiblemente se encuentra en la elusiva “verdadera Constitución” a la cual se hace referencia en ese voto.
Nótese que ese no es el entendido en cuanto al signifi-cado de “administración” al cual ha llegado el Tribunal Supremo de New Jersey, cuya Constitución “fue el modelo utilizado en la redacción de la primera oración de la sec-ción [7]”. Trías Monge, op. cit., pág. 98. Así, al analizar las referidas disposiciones de su Constitución estatal —que son análogas a la See. 7 nuestra— el Tribunal Supremo de New Jersey expresó vehementemente que “[t]hose two provisions give the Chief Justice and the Supreme Court sweeping authority to govern their own house”. (Enfasis y subrayado nuestros.) In re P.L. 2001, Chapter 362, 186 N.J. 368, 379, 895 A.2d 1128, 1135 (2006).
Vemos entonces cómo el más alto Tribunal de ese es-tado, a diferencia del análisis acomodaticio de la disiden-cia, no titubea al afirmar que tanto el Juez Presidente como *590 el Pleno de su Tribunal comparten el poder de administrar los tribunales: un ente establece la política de la Rama Judicial y otro la ejecuta.
Fue precisamente eso lo que ocurrió con la aprobación de las dos Resoluciones de epígrafe. Ante el acto ultra vires efectuado por el Juez Presidente y la Directora Adminis-trativa de la O.A.T., al contratar un ente externo para in-vestigar la conducta de miembros de esta Curia, adverti-mos que el problema surgía de la falta de parámetros reglamentarios para que la Rama Judicial encausara una investigación de la administración en la propia Rama. Por eso, utilizamos el poder expresamente delegado en la pri-mera oración de la See. 7 para formular un cuerpo regla-mentario que administre las investigaciones que lleve a cabo la Rama Judicial sobre sus fondos, su personal y sus funcionarios. No se trata de un acto de usurpación, como pretende hacer creer la disidencia, sino de la utilización de un poder constitucional expreso.
No era posible mantenemos silentes y con los brazos cruzados ante el proceder altamente cuestionable del Juez Presidente y de la Directora Administrativa de la O.A.T. El contrato otorgado al licenciado López Cintrón laceró la imagen de toda la Rama Judicial, al promover un claro conflicto de intereses a nivel institucional: no es éticamente correcto contratar a una persona, sujeta al pago de fondos públicos, para que “investigue” denuncias contra las mis-mas personas que lo contrataron y quienes, a su vez, con-trolan la investigación e instruyen al investigador que, si-multáneamente, le responde a estos. Se trataba, a todas luces, de una “cacería de brujas” o “expedición de pesca” contra todos los jueces y demás funcionarios de la Rama Judicial sin justificación alguna para ello y con el solo pro-pósito ilegítimo de desviar la atención de las serias impu-taciones que pesan contra el Juez Presidente y la adminis-tración de los tribunales, cuya Directora Administrativa es *591 funcionaría de confianza del Juez Presidente por mandato constitucional.
Además, preocupaba la posibilidad de que se interfi-riera con las investigaciones legítimas que otras Ramas constitucionales llevan a cabo y se prestara para intimidar a los testigos potenciales, quienes a su vez son empleados o funcionarios de la Rama Judicial. La secretividad impenetrable con la cual se llevó a cabo la contratación también la rodeó de un aura altamente sospechosa. Ante ello, estába-mos en la obligación de actuar conforme al poder expreso contenido en la See. 7 del Art. V de la Constitución de Puerto Rico.
La utilización de este poder no es algo novel en nuestro ordenamiento, como aparenta sostener la disidencia. Evi-dencia de ello son las innumerables ocasiones en que el Pleno de este Tribunal ejerce su poder de reglamentación para atender diversos tipos de asuntos administrativos. Véanse, por ejemplo: In re Reglas Adm. T.P.I., supra; In re Enmda. Regl. Adm. Pers. R.J., supra; In re Enmda. Regl. Adm. Pers. R.J. I, supra; In re Enmda. Art. 19.1 Regl. A.S.P.R.J., supra. De adoptarse la interpretación de la See. 7 formulada en los votos disidentes, estaríamos de facto anunciando que fueron ejercicios fútiles todas las veces que este Tribunal reglamentó en cuanto a la administración de los tribunales, ya que el Juez Presidente ostentaría el po-der absoluto de administrar la Rama en su carácter individual.
Nuestra interpretación de la See. 7 no significa, como intenta hacer creer la disidencia, que la administración de los tribunales en Puerto Rico debe llevarse a cabo de forma colegiada. Al contrario, se reconoce el esquema dinámico de la doble delegación de poder contenida en la See. 7. El Pleno del Tribunal Supremo tiene facultad constitucional para reglamentar la administración de los tribunales, y el Juez Presidente tiene la facultad de ejecutar las políticas *592 contenidas en esos reglamentos. Si existe un reglamento administrativo aprobado por el Pleno del Tribunal Supremo, el Juez Presidente no puede refugiarse en la se-gunda oración de la See. 7 para argumentar que no está sujeto a este porque ostenta “facultad ejecutiva plena”(10) en su rol de director de la administración de los tribunales. Ergo, es un absurdo decir que si el Pleno del Tribunal Supremo reglamenta un aspecto de la administración de los tribunales se usurpan los poderes del Juez Presidente, ya que la See. 7 expresamente le delegó el poder al Pleno para reglamentar la misma administración que el Juez Presi-dente dirige. Ese es el mecanismo de administración diná-mico que nuestra Constitución creó. No estamos usur-pando facultad alguna del Juez Presidente, sino protegiendo el poder expreso que la See. 7 le provee al Pleno de este Tribunal.
Por eso es verdaderamente asombrosa la manera en la cual los votos disidentes conciben el significado de la pri-mera oración de la See. 7. Tal parece que la existencia de esta los tomó por sorpresa, lo cual podría explicar la razón por la cual aducen que, junto con el texto, debería utili-zarse un inexplicado “ideario colectivo”, “el comporta-miento durante sesenta años de los actores constituciona-les que han vivido su historia” o, incluso, otra “verdadera Constitución” para fijar su significado. Se denota un in-tento desesperado por derramar suficiente tinta como para erradicar esa primera oración de la See. 7 del Art. V de la Constitución de Puerto Rico.
Presumiendo que parte de ese comportamiento de “acto-res constitucionales” se encuentra en los tomos de las De-cisiones de Puerto Rico, rescatemos del olvido un evento en el cual el Pleno de este Tribunal, contando con la anuencia del hoy Juez Presidente, reglamentó la administración de los tribunales de manera novel y controversial.
*593 C. Mediante la Ley 21-1992 (4 L.P.R.A. ant. sec. 1), se creó en Puerto Rico por primera vez un tribunal de apela-ciones intermedio. Un año después, una nueva administra-ción entendió que la manera como fue aprobado ese esta-tuto no era la más apropiada, y abolió mediante legislación el Tribunal de Apelaciones que había sido creado un tiempo antes.
Los jueces nombrados y las juezas nombradas a ese tribunal quedaron entonces fuera de sus puestos. El Juez Presidente en aquel entonces, José Andréu García, reco-mendó al Pleno del Tribunal Supremo que se aprobara un cuerpo reglamentario para crear una unidad especial, ads-crita a la oficina del Juez Presidente, para que los jueces del abolido Tribunal de Apelaciones ejercieran las funcio-nes judiciales que les encomendara el Juez Presidente. El Pleno del Tribunal Supremo de aquel entonces accedió a la solicitud del Juez Presidente y promulgó las Reglas para la Creación y Mantenimiento de la Unidad Especial de Jue-ces de Apelaciones. Regl. Creac. y Func. Unidad Esp. J. Apel., 134 D.P.R. 670 (1993).
Para fundamentar ese proceder administrativo, los Jue-ces que suscribieron la creación de las reglas argumenta-ron que su aprobación era “un ejercicio válido de nuestras facultades constitucionales, tanto expresas como inheren-tes. ... Adoptamos estas reglas como parte de nuestra fa-cultad constitucional de regir nuestro proceso decisorio, es-tructuración y procedimiento interno, y en virtud de las facultades que nos confiere todo el Art. V de nuestra Constitución ...”. (Énfasis suplido.) íd., págs. 676-677, Voto de conformidad de Alonso Alonso, J., al cual se unió en su totalidad Hernández Denton, J.
Los miembros de esta Curia sustentaron, además, que:
Sería un contrasentido jurídico que interpretáramos restric-tivamente nuestras facultades constitucionales cuando preci-samente se trata de proveerle más eficiencia al Poder Judicial, según fue la intención expresa de la Convención Constituyente. Este Tribunal no se puede autolimitar cuando *594 de mejorar la calidad de la administración de la justicia se trata. (Énfasis suplido y en el original.) Regí. Creac. y Fuñe. Unidad Esp. J. Apel., supra, pág. 679.
Ante la aprobación de las Reglas, tres Jueces suscribie-ron votos disidentes. El Juez Asociado Señor Rebollo López no cuestionó la autoridad de la mayoría para aprobar re-glas, pero argumentó que la creación de la Unidad Especial de Jueces de Apelaciones era ultra vires, ya que “[s]e trata-iba], a todos los fines prácticos, de la creación de un tribunal o foro judicial de facto por parte de este Tribunal ...”. (Énfasis en el original.) íd., pág. 688. El Juez Asociado Se-ñor Negrón García, aunque reconoció la facultad constitu-cional del Tribunal Supremo para adoptar reglas adminis-trativas, disintió vehementemente del proceder de la mayoría por considerarlo inconstitucional al crear un tribunal, poder que solo ostenta constitucionalmente la Rama Legislativa. íd., págs. 702-716. Ausente de su disenso, sin embargo, estuvo la amenaza de un derrocamiento constitu-cional y el llamado a “la lucha”, como el contenido en uno de los votos disidentes que hoy se emiten.
Este recuento histórico es altamente revelador. Sin en-trar a dilucidar los méritos constitucionales del reglamento adoptado .en 1993, podemos colegir dos hechos interesantes. Primero, el Juez Presidente Señor Andréu García solicitó al Pleno del Tribunal que adoptara las Re-glas para la Unidad de Jueces Apelativos, la cual estaría adscrita a su oficina. No obstante, si la disidencia tuviese razón en su interpretación de la See. 7 del Art. V de la Constitución, ¿no tenía el Juez Presidente facultad abso-luta para crear esa Unidad Especial y reglamentar su ope-ración? ¿Por qué solicitar entonces a los demás miembros del Tribunal Supremo que adoptaran las reglas? Es obvio que el Juez Presidente Señor Andréu García reconocía la doble delegación de poder de la See. 7 y que la facultad de administrar la Rama Judicial en Puerto Rico es del Juez *595 Presidente x del Pleno del Tribunal Supremo, no exclusiva-mente de quien ocupe la silla presidencial.
Segundo, no podemos más que presumir que este evento es una de esas instancias que forman parte del “ideario colectivo” al que se refiere la disidencia. Presumimos tam-bién que es parte del “comportamiento durante sesenta años de los actores constitucionales que han vivido” la his-toria constitucional de Puerto Rico. Lo contrario sería adoptar una versión selectiva de la historia.
III
Los votos disidentes también dirigen infructuosamente sus ataques a la orden que emitimos en la segunda Reso-lución de epígrafe, In re Miembros Com. Esp. Independiente, 184 D.P.R. 507 (2012). En específico, la disidencia alega que la orden dirigida a la Directora Administrativa de los Tribunales para que dejara sin efecto el contrato otorgado al Ledo. César López Cintrón fue ultra vires, ya que este Tribunal carece de poder para emitir un desacato a través de su función reglamentaria. La disidencia está confundida en cuanto a la naturaleza de las resoluciones de epígrafe.
Es harto sabido que “los tribunales tienen poder inhe-rente para condenar por desacato con el fin de hacer cum-plir sus sentencias, órdenes y autos y conservar el orden en los procedimientos judiciales”. Pueblo v. Pérez Díaz, 99 D.P.R. 788, 801 (1971). Véase, además, E.L.A. v. Asoc. de Auditores, 147 D.P.R. 669 (1999) (per curiam).
En In re Miembros Com. Esp. Independiente, supra, pág. 508, se estableció que:
Según los poderes que nos confieren las Reglas 7 y 8 para los Procedimientos de Investigaciones Especiales Independientes de la Rama Judicial, y en protección de la jurisdicción de la Comisión y la integridad de su encomienda, se ordena a la Directora Administrativa de los Tribunales, so pena de des- *596 acato, que deje sin efecto de manera inmediata el Contrato otorgado por la OAT al Ledo. César López Cintrón y cualquier otra contratación relacionada con la investigación. (Enfasis en el original suprimido y énfasis suplido.)
La disidencia sostiene que este Tribunal carecía de po-der para ordenar la rescisión del contrato del licenciado López Cintrón, so pena de desacato, porque ese poder in-herente no está disponible en el ámbito de reglamentación administrativa de este Foro.
Lo que obvia la disidencia es que la Resolución In re Miembros Com. Esp. Independiente, supra, no fue apro-bada en virtud de nuestro poder para reglamentar la ad-ministración de los tribunales que provee la See. 7 del Art. V de la Constitución. Las medidas contenidas en esa Reso-lución se hicieron al amparo del Reglamento que estableci-mos en In re Aprobación Rs. Proc. Esp. R.J., supra.
En específico, la Regla 7 de ese cuerpo reglamentario establece, en lo pertinente, que “el Tribunal podrá emitir, por iniciativa propia o a petición de la Comisión, todas las órdenes que sean necesarias para proteger la jurisdicción de la Comisión y la integridad de su encomienda”. (Enfasis suplido.) In re Aprobación Rs. Proc. Esp. R.J., supra, pág. 6. Por ende, la orden de rescindir so pena de desacato no se dio conforme nuestra función reglamentaria, sino conforme nuestra función judicial, ya que buscaba proteger la juris-dicción de la Comisión Especial para que pudiese llevar a cabo su encomienda. Ello se hizo al amparo del poder ex-preso otorgado en la Regla 7 para los Procedimientos de Investigaciones Especiales Independientes de la Rama Judicial. Así pues, este Tribunal podía en derecho usar su poder inherente para emitir una orden so pena de des-acato, ya que la orden a la Directora Administrativa de los Tribunales se dio dentro del ámbito de su función judicial.
Por otro lado, en su voto disidente, el Juez Presidente aduce que la orden de rescindir el contrato so pena de des-acato también es ultra vires porque declara una “pena” contra la Directora Administrativa de los Tribunales de ma- *597 ñera “retroactiva”. (11) Nuevamente, la disidencia confunde el ámbito de las Resoluciones de epígrafe.
En ninguna parte de In re Miembros Com. Esp. Independiente, supra, se condena retroactivamente a la Direc-tora Administrativa de los Tribunales ni se rescinde el con-trato de manera retroactiva. Al contrario, se apercibió a la Directora Administrativa que debía rescindir el contrato otorgado al licenciado López Cintrón; no se le condenó por desacato por haber otorgado ese contrato. Tampoco se de-claró nulo el contrato de manera retroactiva, sino que se ordenó su rescisión, ya que no cumplía con la Regla 8 para los Procedimientos de Investigaciones Especiales Indepen-dientes de la Rama Judicial, la cual establece que “[l]a vi-gencia de estas reglas será inmediata y aplicará a todo proceso vigente, comenzado o por comenzar al momento de la aprobación de estas”. In re Aprobación Rs. Proc. Esp. RJ, supra, pág. 505.
Resulta evidente que nunca ordenamos la rescisión del contrato de manera retroactiva.
IV
Curiosamente ausente de gran parte de los votos disi-dentes emitidos hoy es el recuento de la escena dantesca para la cual lamentablemente este Tribunal sirvió de escenario. Y es que la situación que obligó a una mayoría de miembros de este Tribunal a utilizar el poder constitu-cional de la See. 7 se desarrolló en la oscuridad de la noche y a espaldas de todos los Jueces y las Juezas que componen este Foro.
Es por ello que consideramos nuestro deber plasmar para el récord público las actuaciones ultra vires del Juez Presidente Federico Hernández Denton y de la Directora Administrativa de la O.A.T., Sonia I. Vélez Colón, las cua- *598 les causaron las Resoluciones de epígrafe. Resulta real-mente sorprendente que las Juezas Asociadas y los Jueces Asociados de este Tribunal se enteren de una investigación, en la cual se gastarían miles de dólares de fondos públi-cos,(12) al leer en la mañana un diario de circulación general, particularmente en momentos en los cuales algunos empleados de la Rama Judicial reclaman un alza salarial y se aduce la falta de fondos como razón para no concederlo.
Pero más que sorprendentes, las actuaciones del Juez Presidente y de la Directora Administrativa de la O.A.T. transgredieron las delicadas fronteras constitucionales de nuestro ordenamiento. Nos conforta que la Jueza Asociada Señora Fiol Matta, a diferencia de la otra Juez disidente, reconozca que la actuación por parte de la O.A.T. es clara-mente ultra vires, ya que esa Oficina no tiene poder para llevar a cabo investigaciones disciplinarias contra los Jue-ces y las Juezas de este Tribunal. Véase Voto particular disidente de la Jueza Asociada Señora Fiol Matta, pág. 649 esc. 32. A su vez, es refrescante saber que la Jueza Aso-ciada Señora Fiol Matta también reconoce que el poder para velar por el buen uso de los recursos de la Rama Judicial recae tanto en el Pleno de este Tribunal como en la figura del Juez Presidente. Id., pág. 642.
Bajo ninguna teoría de interpretación constitucional in-geniosa puede sostenerse que el Juez Presidente, en su rol de dirigir la administración de los tribunales en Puerto Rico, puede delegar un poder que no ostenta. El Juez Pre-sidente, en su carácter individual, no está facultado para ordenar investigaciones contra los demás miembros de este Tribunal. Por ende, la artimaña a la cual se sometió a este Tribunal por espacio de dos semanas es constitucional-mente inconcebible y seguramente causaría el asombro, el malestar y la indignación de los mismos constituyentes *599 ilustres que cita la disidencia en sus primeras páginas. Ante semejante actuación, era verdaderamente un impera-tivo institucional utilizar los poderes expresos e inherentes de la See. 7 para corregir un grave vicio constitucional en-gendrado a oscuras en los pasillos de la O.A.T.
Por último, nuestra conciencia no puede estar tranquila sin antes hacer constar nuestro asombro ante el lenguaje utilizado en uno de los votos particulares disidentes que hoy se publica. Jamás concebimos llegar a ver una jurista suscribir un voto que raya en una incitación a la violencia desde la trinchera política.
Desde que aceptamos la encomienda de ostentar la toga de la profesión jurídica, hemos sido conscientes de nuestra fragilidad como seres humanos. Jamás osamos pretender que nuestras interpretaciones del Derecho son infalibles; re-conocemos que, como humanos, podemos errar. Por eso nunca suscribiríamos un voto en el cual se acuse a nuestros compañeros juristas de usurpar poderes constitucionales con la intención de causar un “derrocamiento constitu-cional”. Que no quede la menor duda que en el voto disi-dente de la Juez Asociada Señora Rodríguez Rodríguez se acusa maliciosa e irresponsablemente a los miembros de este Tribunal del más alto pecado que puede cometer un magistrado. Esto es particularmente desafortunado, toda vez que varios de nosotros somos Jueces de carrera y hemos la-borado por años desde los estrados de tribunales inferiores.
Como si tal afrenta fuese poco, esa disidencia hace un llamado irresponsable que raya en la incitación a la violen-cia contra este Tribunal. ¿Cómo es posible que se haga una convocatoria a “iniciar la lucha”? ¿Lucha contra qué? ¿Contra quiénes? ¿Desde qué lugar? ¿En la calle o en la trin-chera partidista? ¿Por qué influenciar en estos tiempos ál-gidos al Pueblo a defender la Constitución (o la interpretación que la disidencia hace de esta) “con las uñas y con los dientes”? ¿Por qué acusar a los jueces que suscri-bimos las Resoluciones de epígrafe de “asediar” la Consti- *600 tución de Puerto Rico? ¿Cómo osar imputarle a sus compa-ñeros Jueces el crear un estado de excepción en Puerto Rico y “revocar” el estado de derecho vigente? La disiden-cia es necesaria en todo foro judicial, pero resulta verdade-ramente aberrante el que en cada situación constitucional en la cual existen diferencias de criterio se acuse a la otra parte de causar un holocausto jurídico. La retórica y los sofismas conjurados en el voto disidente de la Juez Aso-ciada Señora Rodríguez Rodríguez retarían al mismo Pro-tágoras(13) y lesionan severamente los entendidos básicos de un tribunal colegiado.
Hace un tiempo, la Juez Asociada Señora Rodríguez Ro-dríguez sentenció injustificadamente en otro virulento voto disidente que “[h]oy ... comienza el medioevo puerto-rriqueño”. In re Solicitud Aumentar Núm. Jueces TS, supra, pág. 142 (Opinión disidente de Rodríguez Rodríguez, J.). ¡Qué épicamente irónico resulta que el “medioevo puer-torriqueño” que presagió quedó verdaderamente inaugu-rado en el voto disidente que hoy ella suscribe!
Por todo lo anterior, estamos conformes con las Resolu-ciones de epígrafe y garantizamos que la amenaza de crisis constitucional que aspira a hacer creer la disidencia no es más que una fantasía hiperbólica. El texto de nuestra Constitución es claro, y si alguien cuestiona la legitimidad del proceder de una mayoría de miembros de este Tribunal —en vez de nuestra interpretación constitucional— su cuestionamiento no debe ir dirigido a los miembros de este Tribunal en su carácter individual, sino al texto mismo de la Constitución. La legitimidad de las decisiones de este Tribunal no es solo responsabilidad de los que en un mo-mento dado ocupamos sillas en este estrado: esa responsa-bilidad la compartimos como Pueblo, sustentados en el en-tendimiento básico de la organización social que adoptamos. “Violar el acto por el cual existe sería des-truirse, y lo que no es nada no produce nada.” J. Rousseau, *601 El contrato social, Madrid, Ed. Aguilar, 1978, Cap. VII, pág. 19.(14)

 Voto particular disidente de la Juez Asociada Señora Rodríguez Rodríguez, pág. 669.

 íd., pág. 660.

 Voto particular disidente de la Jueza Asociada Señora Fiol Matta, págs. 635-636.

 Véase Morrison v. Olson, 487 U.S. 654 (1988), opinión disidente de Scalia, J.

 Véase R. del S. 2509 y R. del S. 2539.

 A la referida reunión extraordinaria del Pleno asistieron la Jueza Asociada Señora Fiol Matta, el Juez Asociado Señor Martínez Torres, la Jueza Asociada Se-ñora Pabón Charneco, el Juez Asociado Señor Kolthoff Caraballo, el Juez Asociado *580 Señor Rivera García, el Juez Asociado Señor Feliberti Cintrón y el Juez Asociado Señor Estrella Martínez.

 Contrario al análisis del voto disidente de la Jueza Asociada Señora Fiol Matta, resulta evidente que la Comisión de la Rama Judicial no hizo distinción alguna en el significado de la palabra “administrar” en las dos oraciones de la See. 7 del Art. V de nuestra Constitución.

 Diccionario de la Lengua Española, http://www.rae.es (última visita, 13 de febrero de 2012).

 La Convención Constituyente recibió diversas propuestas en cuanto a cómo enmendar el sistema de administración de los tribunales. A tales efectos, la Escuela de Administración Pública de la Universidad de Puerto Rico recomendó la creación de un Consejo Judicial que estuviese a cargo del proceder administrativo de los tribunales. Escuela de Administración Pública de la Universidad de Puerto Rico, La Nueva Constitución de Puerto Rico, ed. facsimilar, Río Piedras, Ed. U.P.R., 2005, pág. 472.

 Véase Voto disidente del Juez Presidente Señor Hernández Denton, pág. 612.

 Voto disidente del Juez Presidente Señor Hernández Denton, pág. 629.

 El contrato del licenciado López Cintrón establecía que se le pagarían dos-cientos dólares la hora, hasta un máximo de cien mil dólares.

 Protágoras fue uno de los sofistas mas reconocidos de la antigua Grecia.

 Las referencias a los votos disidentes que se hacen en este Voto de confor-midad responden a las versiones originales que fueron circuladas. Ello debido a que cinco minutos antes de certificarse estos votos, se nos circularon versiones editadas de estos.